BETH ANDERSON, Plaintiff-Appellant, v. GEORGE J. VRAHNOS *et al.*,
Defendants-Appellees.

Second District No. 2—85—0543

Opinion filed November 3, 1986.

Daniel A. Mengeling, of Johnson, Mengeling & Colletti, Ltd., of Woodstock, for appellant.

Daniel P. Field, of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Plaintiff, Beth Anderson, appeals from an order of the trial court of Lake County denying her motion for summary judgment and granting defendant Interstate Fire & Casualty Company's (Interstate's) motion for summary judgment with regard to count I of plaintiff's second amended complaint. Count I sought a declaratory judgment that an oral insurance binder included, as a matter of law, underinsured-motorist coverage in an amount equal to the maximum liability limits offered by the insurer.

On appeal plaintiff contends that the trial court erred (1) in finding that she was uninsured at the time she sustained injury and (2) in failing to find that underinsured-motorist coverage was implied as a matter of law in her contract of insurance.

On May 3, 1983, Richard Anderson (Anderson) purchased a used motorcycle as a gift for his wife, Beth, who is the plaintiff in this

case. On May 5, 1983, Anderson telephoned George Vrahnos, an independent insurance broker who handled other insurance for Anderson, and asked about insurance for the motorcycle. Vrahnos, who claimed he did not usually write motorcycle insurance, pulled from his files a policy he had previously obtained from defendant insurance company on a cycle similar to the Andersons'. He indicated to Anderson that the coverages contained in the other client's policy were $100,000/$300,000 bodily injury, $50,000 property damage, $15,000/$30,000 uninsured motorist, and no collision. Vrahnos also stated a cost for the insurance coverages he had enumerated. According to Vrahnos, Anderson indicated he wanted that coverage. Anderson, on the other hand, stated he did not request any specific coverages, although he seemed to recall Vrahnos mentioning $300,000 liability coverage as well as a discussion to the effect that collision insurance was probably not necessary. Vrahnos indicated that he would send Anderson an application form.

Subsequently, Vrahnos telephoned Interstate and spoke with Pam Morrett, a rating clerk in the auto department of Interstate's Chicago branch who was authorized to give insurance binders (temporary insurance contracts) to insurance agents and brokers. Vrahnos requested authorization to bind the coverages he had discussed with Anderson. Morrett granted authorization for a binder, effective for five working days, and gave Vrahnos a binder number. She also indicated that a completed application would be necessary in order to continue coverage.

The next day, May 6, 1983, Beth Anderson was seriously injured when an auto drove into her as she rode the motorcycle. Anderson notified Vrahnos of the accident on May 9 and indicated he no longer wanted the insurance. When Anderson told him that the driver of the car which struck his wife had $25,000 in liability insurance, Vrahnos convinced Anderson not to cancel the binder until the driver's insurance coverage had been confirmed.

Anderson spoke with an attorney on May 11 and on May 12 asked Vrahnos if he, Anderson, had underinsured-motorist coverage on the motorcycle. That same day Vrahnos secured a binder extension, under a new binder number, from Pam Morrett at Interstate. On May 16 Vrahnos sent an application for permanent insurance to Anderson to be signed and returned. The application included information regarding both uninsured- and underinsured-motorist coverage and offered the prospective insured the option of adding or rejecting underinsured coverage. Also on May 16, Vrahnos told Anderson that he did not have underinsured coverage. On May 17 Vrahnos obtained a second

five-day binder extension from Morrett.

The application for permanent insurance was received by Anderson on May 18, 1983. He signed it but did not check any of the options pertinent to underinsured-motorist coverage. The application form was never returned to Vrahnos by Anderson. Instead, Anderson turned it over to his attorney. On May 20 or 21 Vrahnos repeatedly phoned Anderson, requesting that Anderson sign and return the application. On May 25 Vrahnos secured another binder extension and sent a written insurance binder, covering all prior oral binders, to Anderson, with a copy to Interstate.

Plaintiff filed suit against Vrahnos and Interstate on August 31, 1983. Count I of plaintiff's second amended complaint sought a declaratory judgment against Interstate to determine that, as a matter of law, at the time of the accident plaintiff had $100,000 in underinsured-motorist coverage. Cross-motions for summary judgment were filed by plaintiff and defendant Interstate. After a hearing on the motions, the trial court indicated that it did not think there was any material question of fact to be resolved. The court found that plaintiff was not insured by defendant at the time of her injury because a contract between the Andersons and Interstate had never come into being. According to the court, the Andersons' failure to return the application for permanent insurance constituted a total failure to tender consideration for insurance coverage. Since the trial court held that there was no enforceable contract, it did not address the question of whether plaintiff had underinsured-motorist coverage as a matter of law. Interstate's motion for summary judgment was granted, while plaintiff's was denied. Plaintiff's subsequent motion for reconsideration was also denied, and this appeal followed.

■ Plaintiff appeals from trial court action on cross-motions for summary judgment. Under section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005), summary judgment is proper only when the pleadings, depositions, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Here, we agree with the trial court that there were no material fact issues to be resolved. We also agree that Interstate was entitled to judgment as a matter of law. However, we reach the latter conclusion by a route different from that taken by the trial court. A trial court order, if correct, may be upheld on appeal on grounds other than those relied on by the trial court, regardless of the lower court's reasoning. *Village of Schaumburg v. Franberg* (1981), 99 Ill. App. 3d 1, 9, 424 N.E.2d 1239.

■ The court below resolved the issues in accordance with its analysis of the preliminary question of whether or not there was an enforceable contract between plaintiff and Interstate. Since the court decided there was no contract, plaintiff's claim could not be sustained. The trial court's conclusion, however, that the contract failed for lack of consideration cannot be supported as a matter of law. Return of the application was not needed for consideration since plaintiff had already impliedly promised to pay for the coverage she sought. (See *Elliot v. Villa Park Trust & Savings Bank* (1978), 63 Ill. App. 3d 714, 717, 380 N.E.2d 507.) Mutual and concurrent promises provide sufficient legal consideration to support each other. (*Leisure v. Smith* (1973), 13 Ill. App. 3d 1070, 1073, 302 N.E.2d 177.) In the instant case Interstate promised to provide insurance coverage and the Andersons promised to pay for that coverage. These mutual promises constituted sufficient consideration for the oral contract entered into on May 5, 1983.

Interstate characterizes the return of the application as a condition of the contract. It insists that since the application was not returned no duty arose on its part to cover losses incurred during the five-day term of the binder. We find little support for defendant's position.

The parties do not dispute in any material way what was said in the May 5 conversation between Vrahnos and Morrett. Vrahnos requested permission to bind coverages for the Andersons' motorcycle in specified amounts. Morrett asked for the information she needed for all such binders and quoted a premium. She also authorized the binder, gave Vrahnos a binder number, and told Vrahnos the binder was in effect for five working days and that an application for permanent insurance had to be returned within that time to continue coverage. Although Morrett did not recall being asked, Vrahnos said he requested that an application be sent to him. While the parties do not dispute that these were the verbal contents of the oral contract, they do not agree on the meaning of certain of those contents. Interstate insists that Morrett's statement that an application had to be returned in five days set forth a condition and made it a term of the contract. The Andersons, on the other hand, maintain that the statement meant they would have insurance coverage for the next five days, but no more, unless they returned the application.

■ The first issue raised by the parties requires this court to interpret the oral contract between Interstate and the Andersons. The question of construction of a contract, which does not involve material issues of fact, is a question of law on which a reviewing court may

make an independent determination. *Rymer v. Kendall College* (1978), 64 Ill. App. 3d 355, 359, 380 N.E.2d 1089.

In interpreting an insurance policy, the court is primarily concerned with effectuating the intent of the parties as expressed by the contract. (*State Farm Mutual Automobile Insurance Co. v. Schmitt* (1981), 94 Ill. App. 3d 1062, 1063, 419 N.E.2d 601.) When the terms of an insurance policy are clear and unambiguous, its plain meaning will be given effect. (*State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 255, 430 N.E.2d 641.) There is nothing contained in the language which formed the contract now before us that made Interstate's duty to perform under that contract conditional. While it is uncontested that Vrahnos and Morrett discussed the fact that an application should be executed and returned within the five days covered by the binder, that discussion cannot be transformed into a condition of contract simply by labeling it a condition. Morrett stated in her deposition: "I understood that he was calling for a binder. And then we give them five working days to get us an ap[plication]." Vrahnos said in reference to the conversation: "I bound those limits and asked that they be bound subject to receipt of an application." We interpret this language to reflect not a condition, but rather a twofold understanding: (1) that the insurance coverage was effective immediately; and (2) that the binder, and thus Interstate's duty to provide coverage, would be in effect for five days, and five days only, unless an application was received. The discussion indicated that Interstate wanted some written assurance as soon as possible that the insured was actually going to take out permanent insurance. Interstate justifiably expected to provide a permanent policy to a party to whom it had already extended temporary insurance. The language which formed the contract did not amount to a condition of contract.

Even if the language of the contract is characterized as ambiguous, it still must be construed in favor of plaintiff. Where an insurance policy is ambiguous, it will be construed in favor of the insured and against the insurer who drafted the policy. (*State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 255, 430 N.E.2d 641.) In this case Interstate could easily have instructed Morrett to make the condition it now asserts completely clear and free of doubt before authorizing a binder to any insurance agent or broker. Obviously, it did not do so.

Interstate further argues that Vrahnos' actions after the motorcycle accident show that he understood the binder to be conditional. Interstate points out that Vrahnos repeatedly entreated Ander-

son to sign and return the application and that he ultimately sent Anderson a written binder, with a copy to Interstate. We perceive, however, that Vrahnos' actions are susceptible of a construction favorable to plaintiff. When asked why he kept urging the Andersons to return the application, Vrahnos responded: "I felt that it was incumbent upon me to do something to show somebody that an application was pending." Vrahnos' remark does not necessarily indicate that he believed the Andersons could not recover for the accident which occurred during the binder period unless the application was returned. It is reasonable to believe that Vrahnos knew Interstate's duty to perform had already arisen but feared that the insurer might deny that a binder was ever authorized in the absence of either an application, a written binder, or some other kind of written confirmation that he had been given the binder by Morrett. His subsequent act of sending the Andersons a written binder, with a copy to Interstate, is consistent with this interpretation. Ambiguity, if any, in the contract formed by Vrahnos and Morrett must be construed in favor of the Andersons. *State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 255, 430 N.E.2d 641.

■ Since we have concluded that an enforceable contract existed between plaintiff and defendant Interstate at the time of plaintiff's injury, we must consider plaintiff's second argument. Plaintiff asserts that the contract of insurance between herself and Interstate contained a provision for underinsured-motorist coverage, even though such a provision was not an express term of the oral binder. She maintains that the underinsured coverage she seeks was part of the contract by action of section 143a—2(3) of the Illinois Insurance Code (the Code) (Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(3)). Section 143a—2(3) requires that policies of motor-vehicle-liability insurance, upon renewal or delivery or issuance for delivery, must offer underinsured-motorist coverage in an amount up to the insured's bodily injury liability limits. (Ill. Rev. Stat. 1983, ch. 73, pars. 755a—2(1), (3).) Plaintiff insists that this provision applied to the binder granted by Morrett, that the required offer was never made, and, therefore, the coverage is implied in the binder as a matter of law.

Interstate does not deny that the offer required by the statute must be made when an insurance policy is issued to an insured. Nor does defendant deny that such an offer was not made by Morrett to Vrahnos in the May 5 conversation. Interstate vigorously contests, however, plaintiff's assertion that the binder was within the scope of the word "policy" as that word is used in the statute. Defendant steadfastly insists that section 143a—2(3) was not intended to man-

date offers of underinsured-motorist coverage prior to the authorization of a binder. It is Interstate's position that the statutory requirement becomes effective only prior to issuance of a permanent policy and that the application for permanent insurance it sent to the Andersons contained the requisite offer. Plaintiff responds that Interstate presents to the court no good reason to interpret the word "policy" to exclude oral binders of insurance. The question raised by the parties is one of first impression.

Most of the recent cases interpreting section 143a—2(3) have dealt with the issue of the adequacy of an offer of underinsured-motorist coverage. (*Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419, 488 N.E.2d 548; *Tucker v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d 329, 465 N.E.2d 956.) *Tucker* was particularly invoked by plaintiff here for the proposition that an offer under section 143a—2(3) must meet certain criteria, as set forth in the *Tucker* opinion, in order to be a valid offer. We are aware that *Tucker* clarified the standards which must be met by an insurer when making the offer required by the statute and that the correctness of those standards was affirmed by our supreme court in *Cloninger*. We also acknowledge that the *Cloninger* court perceived section 143a—2(3) as consumer protection legislation when it commented relative to the legislative intent in adopting the section that "[t]he legislature was obviously concerned with adequately compensating injured parties." (*Cloninger v. National General Insurance Co.* (1984), 109 Ill. 2d 419, 424, 488 N.E.2d 548.) Despite these insights into section 143a—2(3), however, neither *Tucker* nor *Cloninger* particularly illuminates the problem now before us. Those cases dealt with the adequacy of an offer. We are trying to determine when the statute requires that the offer be made.

While it is apparent the legislature intended the underinsured-motorist-insurance provisions to protect and benefit insured motorists, it is not so clear it intended that those provisions should apply to temporary insurance binders. Section 143a—2(3) calls for the offer of underinsured-motorist coverage to be made whenever an automobile insurance policy is "renewed or delivered or issued for delivery in this State." (Ill. Rev. Stat. 1983, ch. 73, pars. 755a—2(1), (3).) The definition of "a policy delivered or issued for delivery in the state" found in the cancellation provisions of the Code expressly includes binders, both written and oral. (Ill. Rev. Stat. 1983, ch. 73, par. 755.13(e).) While plaintiff cites this section for the proposition that the legislature considered oral contracts to be subject to being issued for delivery or delivered, it is more significant for helping to determine

whether a binder is a "policy" subject to the section 143a—2(3) "offer" requirements. In section 143.13(e) the legislature chose to specifically include binders in the definition of a policy, but only for purposes of cancellation provisions. As noted by defendant, the definitions in section 143.13 are expressly limited to sections 143.11 through 143.24, all of which treat various aspects of cancellation and nonrenewal. This requirement for notice of cancellation, even on binders, is consistent with the intent to protect the insured. It guarantees that an insured can seek alternate coverage prior to the effective date of cancellation and minimizes the risk of having no coverage at all.

That the legislature considered binders to be policies in the context of regulation of cancellations, however, does not necessarily indicate that the legislature intended to impose upon insurance companies the same duties for issuance of temporary binders as for permanent policies of insurance. Since the legislature saw fit to specifically include binders within the scope of "policies" for purposes of cancellation and nonrenewal provisions, it could have done the same with the definition of a policy for purposes of the offer provisions if it had wished to do so. No special definitions are given for the offer provisions. Nor is there an express inclusion of binders in the general definition of "policy" found in section 2(n) of the Code. Section 2(n) states: "In this Code, unless the context otherwise requires, *** (n) 'Policy' means an insurance policy or contract and includes certificates of fraternal benefit societies, assessment companies, mutual benefit associations, and burial societies." (Ill. Rev. Stat. 1983, ch. 73, par. 614(n).) This inclusion of binders as policies for one purpose but not another could be mere oversight or it could reflect a legislative recognition that a binder is not the same thing as a permanent insurance policy and should not be subject to the same requirements.

Even though Interstate insists the binder here contained a condition, it agrees with plaintiff that a binder is a temporary contract of insurance, intended to provide immediate coverage. As was pointed out earlier, the initial binder was good for only five working days. Each extension kept the insurance bound for only another five days. This is significantly different from a permanent policy, which remains in effect indefinitely as long as the premiums are paid. In effect, a binder might be characterized as a service offered by an insurer. While the insurer certainly, and rightfully, expects a commitment from the insured to apply for permanent insurance and to pay an appropriate premium, the insured benefits from being able to immediately use his car, motorcycle, et cetera, without first having to do the paperwork. The obvious benefit of binders to the insurer is that they are

a very effective means of acquiring new policy holders.

It must be kept in mind also that, at the binder stage, insureds approach the insurance provider, not vice versa. While the approach may be through a company's agent, it will often, as here, be through an independent broker. Under the present system, it is the insured who tells the provider what coverage he wants included in the binder. In contrast, before a permanent policy is issued, it is the insurer who offers to the insured the various coverages which are available. The insured is required to fill out an application for the insurance he desires. The insurer makes a determination as to whether or not it will accept, on a permanent basis, the underwriting risk for the particular applicant. Thus, the procedures for securing permanent insurance are vastly different from those involved in securing a temporary binder.

We are keenly aware also of the possible ill effects of burdening the binder procedure. Insurance companies might be inclined to discontinue the use of binders, at least where they were dealing with independent brokers rather than their own agents. If an offer had to be made prior to issuance of a binder through a broker, the insurance company could not be certain the insured was actually informed and could constantly be at risk of suit. This is unlike the application and renewal procedures where the provider deals directly with the insured. Furthermore, attaching the offer requirements to a binder could set the precedent of equating a binder with a permanent policy and imply that a binder is subject to all other regulations surrounding a permanent policy. This approach would defeat the purpose of a binder altogether.

In light of the significant differences between an insurance binder and a permanent insurance policy, as well as the possible effects of burdening the binder procedure, we believe the legislature did not intend that binders should be considered policies for purposes of the offer of underinsured-motorist coverage mandated by section 143a—2(3). Accordingly, we hold that the binder authorized by Interstate for plaintiff did not, as a matter of law, include underinsured-motorist coverage.

For the foregoing reasons, the order of the trial court of Lake County granting summary judgment for defendant Interstate is affirmed.

Affirmed.

UNVERZAGT and SCHNAKE, JJ., concur.