RALPH KORTE *et al.*, d/b/a Cahokia Partnership, Plaintiff-Appellee, v. NATIONAL SUPER MARKETS, INC., Defendant-Appellant.

Fifth District   No. 5—87—0574

Opinion filed August 19, 1988.—Rehearing denied September 23, 1988.

Ann E. Hamilton, of National Super Markets, Inc., of St. Louis, Missouri, for appellant.

John R. Sprague, of Sprague & Sprague, of Belleville, for appellee.

JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Cahokia Partnership, leased certain premises in the Cahokia Village Shopping Center to defendant National Super Markets, Inc. (National). On September 21, 1986, Cahokia Partnership served a notice of forfeiture on National, alleging numerous violations of the lease and demanding immediate possession of the leased premises. National responded by letter to plaintiff denying certain of the violations and attempting to cure others.

In October of 1986, Cahokia Partnership filed a forcible entry and detainer suit against National and on January 12, 1987, served a notice to quit on National, demanding possession of the premises in 15 days. A bench trial was held in the circuit court of St. Clair County in January 1987. The court found that National had been guilty of material breaches of the lease agreement from January 7, 1986, through the date of trial and that the notice to quit was in conformity with the requirements of the lease and properly terminated it. Finally, the court concluded that National had failed to pay the stipulated rent since September 1986. The court ordered that Cahokia Partnership receive possession of the premises and recover rent at the rate of $2,200 per month. National appeals.

In 1976, National entered into a lease agreement with Joseph Rosin, Cahokia's predecessor in interest, for lease of a building and parking lot in the Cahokia Village Shopping Center. National agreed to pay a base rent of $112,000 per year plus 1.25% of gross sales if annual gross sales exceeded $2 million. The lease permitted National

to use the premises for any service or retail merchandising purpose and to sublet the premises with or without the lessor's consent, depending upon the nature of the subtenant's business. National agreed to keep the premises "in good repair and in a clean and wholesome condition" and to perform repairs and maintenance to all interior non-structural parts of the building as well as to the access roadway.

In 1977, National and Rosin negotiated a modification of the lease whereby National would close its supermarket operated on the subject property and move to a new location which was also owned by Rosin. National's rent on the subject property was reduced to $26,000 per year and the lease term extended to 1997. No percentage-of-sales rental was paid thereafter and Rosin accepted the base monthly rental payment of $2,200 without protest.

In 1982, National sublet the premises to Vernon Dulaney for use as a skating rink. This required substantial modification to the building, to which Mr. Rosin agreed. In 1985, Mr. Dulaney assigned his sublease to Bruce Kelly, who continued to operate the skating rink. At no time were the gross receipts of either subtenant sufficient to trigger the percentage rental provision.

Cahokia Partnership purchased the shopping center, excluding the subject property, in 1985. During 1985, Cahokia Partnership wrote two letters to Rosin complaining about the condition of the property. On January 2, 1986, Cahokia Partnership purchased the property subject to National's leasehold interest. On January 29, 1986, another letter was sent to National complaining about weeds and debris around the building, potholes in the parking lot, and a leaning light standard. National responded by obtaining assurance from its subtenant that the repairs would be made. Cahokia Partnership again wrote National on May 16, 1986, complaining of the condition of the parking lot, weeds and debris around the building, the condition of the downspouts and gutters, and several leaning light standards. National responded by employing a contractor to clear the weeds and debris and to repair the parking lot. National also inspected the light standards and determined that, although leaning slightly, they were securely anchored. National also declined to take any action to replace the missing downspouts, but did repair an outside fixture conduit and light canopy lens.

In February of 1986, the subtenant closed its business. The subtenant subsequently approached National regarding the possibility of reopening and selling toys on the premises. National sought Cahokia Partnership's permission, but the request was refused.

On September 21, 1986, Cahokia Partnership served a notice of

forfeiture on National declaring the lease terminated and demanding immediate possession of the premises. The notice alleged that National breached the lease by failing to tender a percentage rental, failing to submit a written statement of gross sales, leasing the premises to the skating rink, failing to keep the premises in good repair, and failing to provide certificates of insurance. National continued to tender the monthly rent, but Cahokia Partnership refused to accept payment.

On September 24, 1986, National sent a letter to Cahokia Partnership enclosing the certificates of insurance and explaining that the subtenant's business did not generate sufficient gross receipts to trigger the percentage-of-sales rental provision. The letter also indicated that National had again recently cleared the premises of weeds and debris.

In October of 1986, Cahokia Partnership filed a forcible entry and detainer action against National, seeking possession of the premises, an unspecified amount of percentage rental, damages for withholding possession of the property, and attorney fees and costs. Several months later, on January 12, 1987, Cahokia Partnership served a notice to quit upon National. The notice referred to the May 16, 1986, letter as providing National with notice of various lease violations and demanding possession of the premises in 15 days. Cahokia Partnership abandoned the notice of forfeiture at trial, but argued that it did put National on notice of the grounds upon which it intended to declare a forfeiture.

The case was brought to trial on the basis of the January 8, 1987, notice to quit. After a bench trial, the court found National to be guilty of "material breaches of the written lease agreement *** since January 9, 1986, and continuing through the trial of this case," but did not specify the nature of the breaches. The court also found that Cahokia Partnership waived all breaches from January 7, 1986, through August 1986 by accepting rent payments. The court found that the notice to quit complied with the lease requirements and effectively terminated the lease. The court further found that National had failed to pay "the stipulated rent" since September 1986, but did not state whether it was the percentage or base rental National had failed to pay. The court ordered that Cahokia Partnership receive possession of the premises and recover rent at the rate of $2,200 per month.

National raises a number of issues on appeal, the most significant of which is the adequacy of notice issue. Article 19 of the lease provides as follows:

"1. If one or more of the following events (herein sometimes

called 'Events of Default') shall happen and be continuing after 10 days receipt of written notice to Lessee:

\* \* \*

(c) If Lessee defaults in the observance or performance of any other material covenant, condition, agreement or provision hereof and Lessee shall fail to remedy such default within thirty (30) days, or; if such default is of such a nature that it cannot be cured within thirty (30) days, if Lessee shall fail to initiate action to remedy such default within said period and thereafter prosecute the same to completion with due diligence \* \* \*."

Under article 19, the lessee has 30 days in which to cure, or initiate efforts to cure, a material breach. If he fails to do so, then the lessor must provide the lessee with written notice that the lessee is in default and that the lessor intends to declare a forfeiture. If the event which constitutes the breach continues for 10 days after receipt of such notice, the lessor has the right to terminate the lease.

The record establishes that Cahokia Partnership sent National several letters over a one-year period complaining about the condition of the premises. Specifically, the letters complained of weeds and debris around the building, leaning and missing light standards, and potholes in the parking lot. The last letter, dated May 16, 1986, also complained of the condition of the gutters and downspouts, missing canopy light lenses, and a missing wall light fixture. This last letter insisted that these conditions "be remedied within 30 days, as in accordance with your lease."

The record also indicates that National contracted to have the parking lot repaired, had the weeds and debris removed from around the building, and repaired several other conditions noted in the letter. Cahokia Partnership did not communicate further with National until September of 1986, except to deny National's request to permit the sale of toys on the premises by the subtenant.

On September 21, 1986, Cahokia Partnership served notice of forfeiture upon National. The notice listed as reasons for forfeiture National's failure to submit annual gross sales reports, failure to make percentage rental payments, failure to keep the premises in good repair, subleasing the premises without permission, and failing to provide Cahokia Partnership with certificates of insurance and insurance policies. The notice declared the lease terminated and demanded immediate possession of the premises. At trial on Cahokia Partnership's later forcible entry and detainer suit and notice to quit, Cahokia Partnership abandoned the notice of forfeiture except to argue that it put

National on notice of the grounds for the notice to quit.

On January 9, 1987, Cahokia Partnership served notice to quit upon National. This notice listed the same reasons specified in the earlier notice of forfeiture as grounds for termination of the lease. The notice to quit declared the lease terminated and demanded that National surrender possession of the premises in 15 days.

■■ ■ The trial court found that the notice to quit was served in accordance with the notice provision of the lease and properly terminated it. While a reviewing court normally defers to the trial court's findings with respect to questions of fact, contract interpretation is a question of law and where the reviewing court disagrees with the trial court's interpretation of a contract, such interpretation must be set aside in favor of that of the reviewing court. (*Anderson v. Vrahnus* (1986), 149 Ill. App. 3d 251, 255-56, 500 N.E. 2d 110, 113.) Upon reviewing the language of the lease, we disagree with the trial court's finding. We find that in demanding that National surrender the premises in 15 days, the notice to quit did not comply with section 1 of article 19 of the lease.

The notice provision of article 19 clearly provides that the lessor has the right to terminate the lease by sending the lessee written notice indicating the lessor's intent to declare a forfeiture and terminate the lease *if the breach in question continues for 10 days beyond receipt of such written notice.* The notice to quit demanded that National surrender the premises in 15 days; it did not indicate that the lease would be terminated in 10 days if National failed to cure the breach in question. Section 1 gives the lessee 10 days after receiving the lessor's written notice of intent to declare a forfeiture in which to cure the breach or breaches in question. The notice to quit did not give National an opportunity to cure and therefore is not in conformity with the requirements of the lease.

Cahokia Partnership argues that the May 16, 1986, letter and the notice of forfeiture put National on notice of its intent to declare a forfeiture if the listed breaches were not cured. We do not agree. The May 16, 1986, letter, which mentioned only the condition of the premises, indicated that Cahokia Partnership insisted that the condition be remedied within 30 days, as provided in the lease. Section 1(c) of article 19 provides that an "event of default" occurs if a material breach continues for 30 days without cure or attempt to cure. Only after the 30-day period runs has the event of default occurred which permits the lessor to serve written notice of intent to declare a forfeiture if the condition continues for 10 days. In other words, the lessee has 10 days beyond the 30-day period in which to cure and avoid termination

of the lease. This additional 10 days was not provided by the notice to quit.

■■ We further find that the notice of forfeiture cannot be read as providing National with written notice of intent to declare a forfeiture. This notice was a demand for immediate possession of the premises; it did not indicate to National that it had 10 days in which to cure the breaches specified therein. National could not be expected to attempt to cure breaches listed in the notice of forfeiture when, on its face, the notice gave no opportunity to cure and demanded immediate surrender of the premises. To read the notice of forfeiture as putting National on notice of Cahokia Partnership's intent to subsequently terminate the lease in 10 days if the breaches were not cured would be patently unfair to National.

We conclude that the notice to quit did not conform to the requirements of article 19 of the lease and did not effect a termination thereof. While National raises numerous other issues in its brief, we need not reach their merits as Cahokia Partnership's noncompliance with the notice provision of the lease is dispositive of this appeal.

The judgment of the circuit court of St. Clair County is reversed.

Reversed.

HARRISON, P.J., and WELCH, J., concur.