SECOND DIVISION

January 16, 2001

Nos. 1-98-4762, 1-98-4780, & 1-99-244, consolidated 

EMERSON ELECTRIC CO., APPLETON ELECTRIC )

COMPANY, AUTOMATIC SWITCH COMPANY, )

BRANSON ULTRASONICS CORPORATION, )

COMMERCIAL CAM CO.,INC., COPELAND ) APPEAL FROM THE

CORPORATION, EMERSON POWER TRANSMISSION ) CIRCUIT COURT OF

CORPORATION, MIDWEST COMPONENT, INC., ) COOK COUNTY. 

METALOY, INC., MICRO MOTION, INC., )

PEPT CORPORATION (formerly Skil )

Corporation), RIDGE TOOL COMPANY, )

THERM-O-DISC INCORPORATED and WESTERN )

FORGE CORPORATION, )

) 

Plaintiffs-Appellants, )

v. )

)

AETNA CASUALTY & SURETY COMPANY, )

ALLSTATE INSURANCE COMPANY (as )

successor by merger to Northbrook )

Excess & Surplus Insurance Company), ) HONORABLE 

AMERICAN CASUALTY COMPANY OF ) WILLIAM MADDUX,

READING, PA., AMERICAN HOME ASSURANCE ) JUDGE PRESIDING.

COMPANY, AMERICAN INTERNATIONAL )

UNDERWRITERS (AIU) INSURANCE COMPANY, )

CALIFORNIA UNION INSURANCE COMPANY, )

CENTRAL NATIONAL INSURANCE COMPANY )

OF OMAHA, CERTAIN UNDERWRITERS OF )

LLOYD'S LONDON, CHICAGO INSURANCE )

COMPANY, CNA INSURANCE COMPANY, )

COLUMBIA CASUALTY COMPANY, COMMERCIAL )

UNION INSURANCE COMPANY (formerly )

Employers Commercial Union Insurance )

Company), THE CONTINENTAL INSURANCE )

COMPANY (as itself and as successor to )

Harbor Insurance Company), CONTINENTAL )

CASUALTY, COMPANY EMPLOYER'S CASUALTY )

COMPANY, EMPLOYERS' LIABILITY ASSURANCE )

CORPORATION, LTD.,EMPLOYERS REINSURANCE )

CORPORATION, EXCESS INSURANCE COMPANY, )

LTD., FEDERAL INSURANCE COMPANY, FIRST ) 

STATE INSURANCE COMPANY, GRANITE STATE )

INSURANCE COMPANY, HARTFORD ACCIDENT & )

INDEMNITY COMPANY, HIGHLANDS INSURANCE )

COMPANY, THE HOME INSURANCE COMPANY, )

THE INSURANCE COMPANY OF THE STATE OF )

PENNSYLVANIA, INTERNATIONAL SURPLUS )

LINES INSURANCE COMPANY, INTERSTATE FIRE & )

& CASUALTY COMPANY, LEXINGTON INSURANCE ) 

COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, )

NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, )

NATIONAL UNION FIRE INSURANCE COMPANY of )

PITTSBURGH, PA., NORTH STATE REINSURANCE )

CORPORATION, REPUBLIC INSURANCE COMPANY, )

TRANSPORT INSURANCE COMPANY (as successor of )

the liabilities of Transport Indemnity )

Company), THE TRAVELERS INSURANCE COMPANY, )

UNITED STATES FIRE INSURANCE COMPANY, )

WESTCHESTER INSURANCE COMPANY (as successor )

to International Insurance Company), )

WESTPORT INSURANCE CORPORATION (as successor )

to Puritan Insurance Company, formerly )

Manhattan Fire and Marine Insurance Company),)

and ZURICH AMERICAN INSURANCE COMPANY OF )

ILLINOIS, )

Defendants-Appellees. )

JUSTICE GORDON delivered the opinion of the court: 

These three consolidated appeals arise from a declaratory judgment action initially filed by plaintiff Emerson Electric Co. (Emerson) and 15 of its subsidiaries against 57 insurers.  In their suit, plaintiffs sought a determination that the insurers owed coverage for liabilities resulting from environmental contamination at 60-some sites throughout the United States.  In September 1997, six months after filing their second amended complaint, plaintiffs moved for summary judgment against one of the defendants, Republic Insurance Company (Republic), as to one of the contamination sites, in Hatfield, Pennsylvania.  Subsequently a group of defendants, including Republic, Commercial Union Insurance Company (Commercial Union), and The Home Insurance Company (Home) moved for summary judgment as to the contamination sites at Erie and York, Pennsylvania, with defendant Central National Insurance Company of Omaha (Central National) joining only the motion as to the York site.  Republic and Home also moved for summary judgment as to a fourth site, at Maysville, Kentucky, and Republic moved for summary judgment as to a fifth site, at Dixiana, South Carolina.  

In February 1998 the trial court denied plaintiffs' motion for summary judgment against Republic as to the Hatfield, Pennsylvania, site.  The court subsequently certified that interlocutory order for appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308), certifying the following question for appeal: "[D]id Plaintiffs satisfy the burden of proving an 'occurrence,' as defined in Defendants' policies?"  Plaintiffs applied for leave to appeal, which this court granted.  That appeal is No. 98-4762. 

In orders entered in the latter part of 1998, the trial court granted summary judgment in favor of defendants as to the other four sites: Erie and York, Pennsylvania; Maysville, Kentucky; and Dixiana, South Carolina.  Specifically, the court granted summary judgment in favor of: (1) Republic as to the sites in Erie and York, Pennsylvania, Maysville, Kentucky, and Dixiana, South Carolina; (2) Home as to the Erie and York sites and the Maysville, Kentucky, site; (3) Commercial Union as to the Erie and York sites; and (4) Central National as to the York site.  In a series of orders entered December 10, 1998, the trial court made all but one of those judgments appealable pursuant to Supreme Court Rule 304(a) 
(155 Ill. 2d R. 304(a)).  Plaintiffs' appeal of those judgments, filed December 21, 1998, is docketed at No. 98-4780.  On January 7, 1999, the trial court made the remaining judgment (the granting 
of summary judgment in favor of Home as to the York, Pennsylvania, site) appealable pursuant to Rule 304(a).  Plaintiffs' appeal from that judgment is docketed at No. 99-244.  

Four plaintiffs are involved in the instant appeals.  They are Emerson Electric Company (Emerson), Emerson Power Transmission Corporation (Emerson Transmission), Ridge Tool Company (Ridge Tool), and Therm-O-Disc, Incorporated (Therm-O-Disc).  The appeals at bar involve these plaintiffs' claims for coverage against the four previously identified defendants (Republic, Home, Commercial Union, and Central National) for liabilities arising from damage at five contamination sites which, as noted, are at Hatfield, York, and Erie Pennsylvania; Maysville, Kentucky; and Dixiana, South Carolina.  

For the reasons set forth below, we affirm the trial court's granting of summary judgment in favor of Home and Commercial Union as to the Erie, Pennsylvania, site (appeal No. 98-4780), and in favor of Home (appeal No. 99-244) and Commercial Union (appeal No. 98-4780) as to the York, Pennsylvania, site; we affirm the granting of summary judgment in favor of Republic as to its 1984-1985 policy with regard to the Erie and York sites (appeal No. 98-4780); and we affirm the granting of summary judgment in favor of Central National as to the York site (appeal No. 98-4780).  

We reverse the trial court's granting of summary judgment in favor of Republic as to its 1983-1984 policy with regard to the York and Erie sites (appeal No. 98-4780); we reverse the granting of summary judgment in favor of Republic and Home as to the Maysville, Kentucky, site (appeal No. 98-4780); we reverse the granting of summary judgment in favor of Republic as to the Dixiana, South Carolina, site (appeal No. 98-4780); and we reverse the denial of Emerson's motion for summary judgment against Republic as to the Hatfield, Pennsylvania, site (appeal No. 98-4762), and remand for further proceedings consistent with this opinion. 

BACKGROUND

This case began in March 1993 with the filing of plaintiffs' initial complaint for declaratory judgment and other relief.   Plaintiff Emerson Electric Company (Emerson) and 15 of its subsidiaries filed suit against 57 insurers seeking coverage under certain comprehensive general liability (CGL) policies issued by defendant insurers from at least 1941 to 1985.  The initial complaint was predicated upon underlying actions charging plaintiffs with liability for environmental property damage at 60-some sites located in 26 states.  Plaintiffs sought coverage for that liability pursuant to the defense and indemnity obligations in defendant insurers' policies.  As the litigation progressed, the number of parties and the number of sites diminished, primarily through settlements and dismissals.

Plaintiffs' second amended complaint for declaratory judgment, filed in 1997, contains essentially the same allegations as their initial and first amended complaints
.  In the second amended complaint, Emerson and 13 of its subsidiaries (hereinafter referred to collectively as Emerson or plaintiffs) sued some 37 insurers seeking coverage under certain primary and excess liability policies issued since 1941.  The second amended complaint was predicated upon underlying actions charging plaintiffs with liability for environmental property damage at some 47 sites in 22 states.
(footnote: 1)   Plaintiffs allege that they have incurred more than $18.4 million in defense costs and damages, and they anticipate "significant further expenditures."  According to plaintiffs, with the exception of one defendant, Hartford Accident & Indemnity Company, which paid $2,617.73 to the Skil Corporation (now plaintiff PEPT Corporation) in connection with defense costs associated with a site in Indiana, no defendant has paid any amount to plaintiffs in connection with any site, nor has any defendant assumed the defense of any plaintiff in connection with any site. 

Included in the second amended complaint and its attached exhibits are descriptive listings of the parties and the contamination sites, as well as a listing of the insurance policies at issue.  Because the instant appeals involve just four plaintiffs and their claims for coverage against four defendants as to five sites, descriptions of only those parties and sites, as well as the relevant insurance policies, are included in the information below.   

The parties

Emerson, the lead plaintiff and parent of the remaining plaintiffs, is a Missouri corporation with its principal place of business in Ferguson, Missouri, a suburb of St. Louis.  Emerson's 40 divisions and subsidiaries manufacture a wide range of electric, electromechanical, and electronic products for industry and consumers, including electric motors, tools, industrial machinery, control devices, and computer support systems.  Since the 1950s, Emerson has grown largely through the acquisition of existing businesses.  

The remaining plaintiffs involved in these appeals are: Emerson Power Transmission Corporation (Emerson Transmission), a Delaware corporation with its principal place of business in Ithaca, New York; Ridge Tool Company (Ridge Tool), an Ohio corporation with its principal place of business in Elyria, Ohio;  and Therm-O-Disc, Incorporated (Therm-O-Disc), an Ohio corporation with its principal place of business in Mansfield, Ohio. 

As each of the plaintiff subsidiaries was acquired, Emerson's practice over the years was to immediately add that subsidiary as a named insured under the Emerson insurance policies.

The four defendants involved in the instant appeals are: (1) Republic Insurance Company (Republic), a Delaware corporation with its principal place of business in Dallas, Texas; (2) 

Central National Insurance Company of Omaha (Central National), a Nebraska corporation with its principal place of business in Omaha; (3) Commercial Union Insurance Company (Commercial Union), a Massachusetts corporation with its principal place of business in Boston; and (4) The Home Insurance Company (Home), a New Hampshire corporation with its principal place of business in New York, New York.   

Insurance policies and the pollution exclusion

The insurance policies at issue in these appeals are excess or umbrella comprehensive general liability (CGL) policies providing coverage at various contamination sites in more than one state.  The relevant policies issued by Republic are No. CDU 15502, effective from November 1, 1983, to November 1, 1984; and No. CDU 16724, effective from November 1, 1984, to November 1, 1985. Republic's policies are implicated by the trial court's judgments as to all five of the sites at issue in these appeals: Maysville, Kentucky; Erie, York, and Hatfield, Pennsylvania; and Columbia (Dixiana), South Carolina.  Central National's policies, which are implicated at only the York, Pennsylvania, site, are Nos. CNS 13-3071 and CNS 13-3073, both of which were issued to the A.B. Chance Co. (Chance), a former Emerson subsidiary, for the period November 1, 1982, to November 1, 1985.  The policies issued by Commercial Union are No. EK-8083-001 for the period November 1, 1971, to November 1, 1974; and No. EK-8083-007 for the period November 1, 1974, to October 1, 1976.  Commercial Union's policies are implicated at both the Erie and York sites in Pennsylvania.  Finally, the Home policies, which are implicated by judgments as to the sites in Erie and York, Pennsylvania, and Maysville, Kentucky, provided coverage for the period from November 1, 1973, to October 1, 1976.  

All but one of these policies contain essentially the same standard form pollution exclusion.  That exclusion, as stated in Republic policy No. CDU 16724, provides as follows:

"It is agreed that this policy does not apply to liability for personal injury or property damage arising out of the discharge, dispersal, release, escape, or seepage of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, unless such discharge, dispersal, release or escape is 
sudden and accidental
." (Emphasis added.)   

Thus on the face of these policies there is no coverage for damage resulting from a discharge or release of pollutants unless the discharge is both sudden and accidental.  Republic policy No. CDU 15502, effective November 1, 1983, to November 1, 1984, contains the same exclusion but with the words "sudden and" omitted.  Hence under that exclusion, the requirement that the discharge be both sudden and accidental is removed; the release of pollutants need only be accidental.  

Environmental damage sites

As noted, there are five contamination sites at issue in the instant appeals.  According to the complaint, the site in Erie, Pennsylvania, is the Millcreek Dump, which was operated from 1941 until it was closed by the state in 1981.  Urick Foundry, a division of plaintiff Ridge Tool, allegedly sent foundry sand to the Millcreek site during the period from 1973 to 1981.  Metals, solvents, and PCBs were found in soil and groundwater at the site.  The EPA sued Emerson over the Millcreek matter, as did neighboring landowners.  According to Emerson, it has incurred expenses of $1.9 million in connection with this site. 

A second Pennsylvania site is a landfill in York to which Chance, an Emerson subsidiary from 1975 to 1987, allegedly sent waste materials.  According to a former employee, wastes were removed by a contractor from the Chance facility in 55-gallon drums and taken to the landfill.  When Emerson sold a majority share of Chance in 1987, Emerson retained Chance's liability for environmental property damage which occurred prior to the sale.    Subsequently, Chance was named as a potentially responsible party by the EPA in connection with the York site.  Emerson asserts that it has incurred expenses of $432,000 in connection with that site. 

Also in Pennsylvania is the Hatfield site, a contaminated aquifer running beneath the Hatfield area.  Various solvents, including TCE, have been found in the aquifer, which is served by the North Penn Water Authority.  Brooks Instruments (Brooks), an Emerson division which was acquired in 1964, has been named as a potentially responsible party as to the Hatfield site.  

The fourth site at issue in these appeals is in Dixiana Township, South Carolina.  The EPA filed a cost recovery action against Therm-O-Disc, an Emerson subsidiary, and certain other companies which allegedly shipped materials to the Dixiana site, where various contaminating compounds have been discovered.  The Therm-O-Disc facility in Aiken, South Carolina, allegedly sent contaminants including perchloroethylene (PCE), waste oil, acetone and glycol to the site between 1978 and 1980.  Emerson estimates that it has spent more than $1.7 million in connection with this site.   

The fifth contamination site is Emerson Transmission's Browning Manufacturing Division (Browning) facility in Maysville, Kentucky. The Browning facility, which has operated for about 100 years, manufactures power transmission components including sprockets, pulleys and bushings.  Groundwater and soil

at this site have been found to contain solvents, volatile organic compounds, and total petroleum hydrocarbons.  The Kentucky Department for Environmental Protection is overseeing cleanup of the site.  According to Emerson, it has spent more than $1.9 million in connection with this site.  

Summary judgment proceedings

Subsequent to the filing of plaintiffs' first amended complaint and prior to the filing of their second amended complaint, several defendants, including Republic and Commercial Union, moved for partial summary judgment seeking a determination that many of the claims for which plaintiffs sought coverage did not constitute recoverable "damages."   According to defendants, their policies provided coverage for sums which the insured was obligated to pay 
as damages
, which defendants asserted were legal, compensatory damages only.  They argued that most of the claims for which Emerson sought relief were for costs expended to comply with government-mandated cleanup of contamination.  Such claims, defendants contended, were for injunctive or specific-performance relief imposed under an equitable mandate to protect the broad public interest, and thus were equitable in nature and not within the meaning of "damages" as stated in their policies.   Defendants also asserted that, under Illinois choice-of-law rules, Missouri law applied to all of the sites in this case, and that under Missouri law, amounts paid for reimbursement of governmental response and cleanup costs are equitable in nature and thus are not covered "damages." 

Resolution of defendants' motion required a determination as to the choice of law with respect to each of the sites.  After seeking additional discovery from all parties, the trial court held that the law of that state where each site was located would apply. 
 
Since none of the sites was located in Missouri, defendants' motion for partial summary judgment under Missouri law was denied as moot.  In reaching its choice-of-law decision, the court noted that under a significant-contacts analysis, Missouri had the most significant contacts with the insurance contracts at issue.  
However, the court chose instead to apply a "public policy" analysis which emphasized each state's strong interest in cleaning up environmental damage on the sites within its borders, pursuant to its own laws. 
   

More than two years later Emerson moved for reconsideration of this 1996 ruling,
(footnote: 2) seeking the application of the law of a single state rather than the law of the site.  According to Emerson, the single state whose law should be applied was Illinois.  In opposing Emerson's motion, Republic argued that the trial court was not required to choose the law of a single state.  However, Republic also restated its position that under a "most significant contacts" approach, Missouri law should apply.  Commercial Union argued that the trial court should decline to revisit the choice-of-law issue "[b]ecause of the substantial prejudice to defendants if choice of law is altered at this late stage in the litigation."  Notwithstanding this argument, Commercial Union stated that if the court 
were
 to revisit the issue, Missouri law should be applied because "Missouri is the state with the most significant contacts to this litigation."  Neither Home nor Central National opposed Emerson's motion.  The trial court denied the motion for reconsideration.   

Subsequent to the filing of plaintiffs' second amended complaint, several defendants including the four involved in these appeals (Republic, Home, Central National and Commercial Union) filed another group of summary judgment motions which, in accordance with the trial court's earlier choice-of-law determination, were predicated upon the respective laws of each of the individual sites.  Those motions form the basis for two of the three instant appeals, Nos. 98-4780 and 99-244.  As noted, a separate summary judgment motion was filed by plaintiffs against defendant Republic and is the basis for the third appeal, No. 98-4762, which will be discussed later in more detail.

This round of defendants' motions began in mid-1998 with motions for summary judgment as to the Millcreek Dump site in Erie, Pennsylvania, and the Old City of York Landfill in York, Pennsylvania.  Defendants Republic, Commercial Union and Home moved for summary judgment as to both sites, while Central National's motion applied only to the York site.  According to defendants, Emerson's liability at these sites arose from the routine delivery of wastes over a long period.  Plaintiffs in fact stipulated that there was no evidence at either site of an "abrupt" discharge. Thus defendants argued that under Pennsylvania law the contamination at the Erie and York sites did not result from a sudden and accidental event as required by their policies, and there was thus no coverage for those sites.  

On August 17, 1998, the trial court granted the motions for summary judgment at both the York and Erie sites, concluding that the contamination at those sites occurred over an extended period of time and could not be considered sudden and accidental under Pennsylvania law.  On October 30, 1998, the court entered a separate order granting Republic's motions for summary judgment at the York and Erie sites.  The court noted that its August 17 decision was dispositive only as to Republic's 1984-1985 policy and not as to the 1983-1984 policy, which (unlike the later policy) required only that the discharge of pollutants be accidental.  Focusing on plaintiffs' disposal of the wastes at each site, which took place over a period of time, the court held that such gradual disposal or pollution could not be considered accidental under Pennsylvania law.  Thus there was no coverage as to the York and Erie sites under Republic's 1983-1984 policy either.  

Republic moved in September 1998 for summary judgment as to the Dixiana, South Carolina, site and the Maysville, Kentucky, site.  With respect to its Dixiana motion, Republic made the 

same argument it previously made under the law of Missouri.    According to Republic, the costs for which Emerson sought coverage at the Dixiana site were for government-mandated cleanup.  Under South Carolina law, Republic asserted, such relief is equitable in nature and does not constitute "damages" as defined in Republic's policies.  In the Maysville, Kentucky, motion, Republic, joined by Home, argued that the discharge of contaminants at this site was routine, intentional and deliberate, and that under Kentucky law such discharges are not accidental events covered by a commercial liability policy.  As noted, both of Republic's policies at issue exclude coverage for damage arising from a discharge of pollutants unless the discharge is accidental. 

On November 18, 1998, the trial court granted the motions for summary judgment at both sites. As to the Dixiana, South Carolina, site, the court agreed with Republic and held that under South Carolina law the relief sought by Emerson, 
i.e.
, government-mandated response and cleanup costs, was equitable in nature and not within covered "damages" as stated in general liability policies.  As to the Maysville, Kentucky, site, the court rejected Emerson's argument that a degreaser accident in the 1960s which allegedly resulted in a sudden and accidental release of solvent was a cause of the contamination at issue.  The court agreed with Republic and Home that the contamination resulted from Emerson's "routine and deliberate business practices" and thus was neither sudden nor accidental, and therefore not covered under any of Republic's relevant policies. 

The trial court subsequently made a finding that the judgments included in its August 17, October 30, and November 18, 1998, orders were appealable pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).  On December 10, 1998, the trial court entered Rule 304(a) findings of appealability as to its granting of summary judgment in favor of: (1) Republic, Home, Commercial Union, and Central National as to the York, Pennsylvania, site; (2) Republic, Home, and Commercial Union as to the Erie, Pennsylvania, site; (3) Republic and Home as to the Maysville, Kentucky, site; and (4) Republic as to the Dixiana, South Carolina, site.  The appeal docketed at No. 98-4780 consists of Emerson's appeals from all of those judgments except the granting of summary judgment in favor of Home as to the York, Pennsylvania, site.  As noted, Emerson's appeal from that judgment is docketed at No. 99-244.  

The third appeal at bar, No. 98-4762, arose from Emerson's motion for summary judgment against Republic as to the Hatfield, Pennsylvania, site.  Emerson argued that under Pennsylvania law, accidental releases of contaminants at Emerson's Church Road (Brooks) facility during the 1960s were covered under Republic's 1983-1984 policy (No. CDU 15502), which as noted allowed coverage for damages resulting from any accidental discharge of pollutants.  The trial court denied Emerson's motion, noting that Republic's policy provided coverage for damages caused by "an occurrence," and concluding that Emerson had not shown that there was such an "occurrence."  The trial court subsequently certified this interlocutory order for appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308), and this court accepted it.  The following question was certified for appeal: whether plaintiffs had satisfied the burden of proving an "occurrence" as defined in defendants' policies. 

CONTENTIONS ON APPEAL

Emerson's main argument on appeal is that the trial court erred in applying the law of the site where the environmental damage occurred.  Instead, argues Emerson, the court should apply the law of a single state, and that single state is Illinois and not Missouri.  In support, Emerson urges that it is Illinois which has the most significant contacts to the case.  Moreover, Emerson contends that Illinois law should control over Missouri law on public policy grounds, in that the application of Illinois law would compel the defendant carriers to act in accordance with their coverage representations made when the pollution exclusion was first incorporated into the standard CGL policies.  Emerson also argues that as between Illinois and Missouri, regardless of which state has the most significant contacts, defendants waived their right to argue at this time for the application of Missouri law.

Additionally, Emerson argues on appeal that even if the law of the individual sites were to be applied, the trial court erred in its application of portions of that law.  
With regard to the Erie and York, Pennsylvania, sites, Emerson has stipulated that there was no evidence of abrupt releases of contaminants at those sites, and thus Emerson concedes that under Pennsylvania law, which interprets the pollution exclusion temporally, the standard "sudden and accidental" exclusion clause would bar coverage for releases at those sites.  However, Emerson contends that the trial court erred in concluding that coverage was also barred under Republic's "amended" pollution exclusion in its 1983-1984 policy, where the words "sudden and" were deleted from the exclusion provision.  According to Emerson, that provision excludes coverage only for pollution that was intentional, without reference to whether it was abrupt or gradual.  Accordingly, Emerson would have it provide coverage for the pollution at the York and Erie sites, where Emerson maintains that the discharges of pollutants were both unexpected and unintended.     

Emerson argues further that the trial court's remaining applications of the law of the site also were in error.  As to the Maysville, Kentucky, site, Emerson argues that regardless of whether contamination in one portion of the site resulted from routine practices, there is evidence of a sudden, accidental discharge in another area of the site, thus raising a triable issue as to whether that discharge, which satisfies the standard pollution exclusion requirements, caused damage for which Emerson is liable.  

Emerson's argument as to the Dixiana, South Carolina, site is that, contrary to defendants' contentions, environmental response and remediation costs are covered "as damages" under South Carolina law.  Finally, with regard to Emerson's own summary judgment motion against Republic as to the Hatfield, Pennsylvania, site, Emerson contends that it has shown an "exposure to conditions" resulting in property damage at the site, and thus has established an "occurrence" within the meaning of Republic's 1983-1984 policy.  

DISCUSSION

We turn now to Emerson's main argument on appeal, that the trial court erred in making its law-of-the-site determination that the law of each state applied to the sites within its borders.  According to Emerson, that ruling, if upheld, would mean that the laws of at least 20 different states would have to be applied in order to resolve all of the disputes in this case.  Emerson contends that the court instead should have applied the law of the single state with the most significant contacts to the litigation, which in Emerson's view is Illinois.  Defendants Republic and Commercial Union do not dispute that it is the law of the single state with the most significant contacts which should apply, but they argue that Missouri is the state with those contacts.  Defendant Home agrees with Republic and Commercial Union that Illinois law does not apply, but it takes no position as to whether Missouri law or the law of the site should control.  Central National takes essentially the same position as Home, but argues that for practical reasons the trial court's law-of-the-site determination should be affirmed.  We agree with Republic and Commercial Union that it is Missouri law which controls here and that the parties are not precluded from urging its application in this appeal.   

We note initially that the trial court's law-of-the-site ruling, which we review 
de novo
 (see
 
Malatesta v. Mitsubishi Aircraft International, Inc.
, 275 Ill. App. 3d 370, 384, 655 N.E.2d 1093, 1102 (1995)), runs counter to this court's decision in 
Maremont Corp. v. Cheshire
, 288 Ill. App. 3d 721, 681 N.E.2d 548 (1997).  In 
Maremont
, the plaintiff sought coverage from its insurers for environmental claims against the plaintiff in five states.  The court applied a significant-contacts test and chose the law of Illinois over the law of the state where the pollution occurred. That decision, the court noted, enabled the parties to "'obtain a consistent interpretation' of the policies."  
Maremont
, 288 Ill. App. 3d at 727, 681 N.E.2d at 552.  "A contrary result," the court stated, "would open these policies to five different views of the law, depending on the site of the risk.  That would not be good policy or good law."  
Maremont
, 288 Ill. App. 3d at 727, 681 N.E.2d at 552; see also 
Aetna Casualty & Surety Co. v. Dow Chemical Co.
, 883 F. Supp. 1101, 1108 (E.D. Mich. 1995) ("[T]he application of the law of the site creates the result that one insurance policy could be interpreted differently in different locations").  Likewise in the instant case, the trial court's application of the law of the site would open the policies at issue to possibly inconsistent interpretation depending upon the individual law to be applied at each individual site.
(footnote: 3)  See 
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520, 527, 655 N.E.2d 842, 845 (1995); see also 
Lee v. Interstate Fire & Casualty Co.
, 86 F.3d 101, 103 (7
th
 Cir. 1996) (noting that obtaining a "consistent interpretation" of the policy is "in the end what 
Lapham-Hickey
 stands for").  We therefore reject the trial court's law-of-the-site ruling. 

Since it is undisputed that the policies at issue in this litigation contain no choice-of-law provision, we apply the general choice-of-law rules of the forum state, Illinois, to determine which state's law should apply.  See 
Diamond State Insurance Co. v. Chester-Jensen Co.
, 243 Ill. App. 3d 471, 485, 611 N.E.2d 1083, 1093 (1993).  Under Illinois choice-of-law rules, "insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.'"  
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520, 526-27, 655 N.E.2d 842, 845 (1995) (quoting 
Hofeld v. Nationwide Life Insurance Co.
, 59 Ill. 2d 522, 528, 322 N.E.2d 454, 458 (1975)). 
 These factors are not all of equal significance.  The weight to be accorded each depends upon the issue involved.  See 
Employers Insurance of Wausau v. Ehlco Liquidating Trust
, 309 Ill. App. 3d 730, 739, 723 N.E.2d 687, 694 (1999) [hereinafter 
Wausau
]; Restatement (Second) of Conflict of Laws §188(2) (1971) (contacts which are to be considered in a "most significant relationship" analysis "are to be evaluated according to their relative importance with respect to the particular issue").  To assist in the application of the 
Lapham-Hickey
 analysis, consideration should be given to the justified expectations of the parties and to the predictability and uniformity of the result, as well as to ease in determination and application of the law to be applied.   See Restatement (Second) of Conflict of Laws §6(2)(d), (f), (g); Explanatory Notes, Comment 
c
, at 12, Comment 
g
, at 15, Comment 
i
, at 15-16 (1971) (listing factors relevant to a choice-of-law determination).  

In applying the test enunciated in 
Lapham-Hickey
, we conclude on balance that of any single state, the law of Missouri is most readily applicable. We now proceed with an analysis of each of the 
Lapham-Hickey
 factors.   

The location of the subject matter here is the location of the risk insured by the policy.  In the instant case those risks are located at the various contamination sites which gave rise to Emerson's liability.  As indicated, there are more than 40 such sites scattered throughout the country in 20 different states.  Though the location of the insured risk is often seen as the most important factor in this sort of analysis, that is not the case where, as here, the risk locations are scattered throughout several states. "The location of the insured risk [is] given greater weight than any other single contact *** provided that the risk can be located, at least principally, in a single state.  Situations where this cannot be done, and where the location of the risk has less significance, include *** where the policy covers a group of risks that are scattered throughout two or more states." Restatement (Second) of Conflict of Laws §193, Comment 
b
, at 611-12 (1971); see also 
Wausau
, 309 Ill. App. 3d at 739, 723 N.E.2d at 694  ("[T]he location of the subject matter of the contract, such as the location of the risk insured by an insurance policy, is entitled to little weight when the subject matter or risk is located in more than one state").  Since the policies at issue here provide coverage for sites located in more than one state, little weight is given the location of the subject matter in this analysis.
 

With respect to the place of delivery of the contract, there is the uncontested testimonial evidence of a single witness, Michael Zimmer, that the originals of the policies issued by defendant Home were personally delivered to Emerson's corporate headquarters in St. Louis, Missouri, and that originals of nearly all of Emerson's policies were kept in a safe at the St. Louis headquarters.  Emerson does not appear to contest this fact, but instead urges that overriding focus be given to its claim that the policies were negotiated, sold and delivered largely through brokers in Chicago.  This contention will be dealt with more fully below in the context of domicile since it does not challenge the element of place of delivery now under discussion.  In this regard we note that even "[i]n the absence of proof as to where the policy was delivered it is presumed that delivery took place at the insured's residence."  2 Couch on Insurance 2d §16:6, at 492 (rev. 1984).  Thus to the limited extent that the place of delivery is relevant to a choice-of-law determination, under the totality of all other relevant facts and circumstances, we would conclude the place of delivery to be Emerson's corporate headquarters in Missouri.  

With regard to the last act giving rise to a contract, Emerson argues that the issuance of an insurance binder should be deemed the last act giving rise to an enforceable insurance contract.  Emerson contends that since the policies were negotiated largely by brokers in Chicago, then the state where the last act took place, 
i.e.
, where the binder was issued, is Illinois.  The authorities cited by Emerson in support of this proposition do not in fact reach that conclusion.  See 
Anderson v. Vrahnos
, 149 Ill. App. 3d 251, 259, 500 N.E.2d 110, 115 (1986); 
Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Insurance Co.
, 962 F.2d 628, 633 (7
th
 Cir. 1992).   

Republic urges that the focus should be on the payment of premiums, which according to Republic were paid by Emerson to its brokers in Missouri.  Hence, Republic argues that the last act to give rise to the contracts took place in Missouri.  This position is in accord with the treatises.  See 4 Appleman on Insurance 2d §21.6, at 278 (1998) (typically, last act required to make policy effective takes place in "the state where the policy is delivered and the premiums are paid"). 

Regarding the place of performance, a major factor which courts look to in determining the place of performance of an insurance policy is the place where the claim is to be paid.  See 4 Appleman on Insurance 2d §21.7, at 309 (1998).  However, the parties in the instant case have not shown us enough in the record with a direct bearing on that question.  Emerson's position, for example, appears to be that since defendants' performance of the contracts will fund the remediation of contamination sites, we should look to the place of remediation, 
i.e.
, the contamination site, as the place of performance.  Emerson notes that four of those sites are in Illinois while none are in Missouri.  Republic contends that Missouri is the place of performance, emphasizing that the procurement of insurance coverage for Emerson and its subsidiaries was coordinated out of St. Louis.  However, the place from which procurement was coordinated is not necessarily the place where the claim was to be paid.  

Where there is no express agreement as to the place of performance, it may be determined according to the intent of the parties, namely, the intended place of the insurer's payment of claims under the policy.   See 2 Couch on Insurance 2d §16:11, at 497 (rev. 1984).  Here the parties' intent is in doubt.  In such a case, we look to the state where the insured is located.  See 2 Couch on Insurance 2d §16:11, at 497 (rev. 1984) (where parties' intent is in doubt, applicable principle is that the creditor seeks out the debtor; hence, insurer "make[s] payment [
i.e.
, performs] in the state where the insured is located").  Accordingly, if the "insured" is viewed here as Emerson, the parent corporation, with its headquarters in St. Louis, then under that analysis the place of performance would clearly favor Missouri, where Emerson's headquarters is located.  Even if the "insureds" are seen as the individual plaintiff subsidiaries, which as noted are located in more than one state, it would be of little help to Emerson in establishing Illinois as the state whose law should apply, since in that instance the place of performance would be given little weight as a factor in our analysis.  See Restatement (Second) of Conflict of Laws §188, Comment 
e
, at 580 ("place of performance can bear little weight in the choice of the applicable law when *** performance by a party is to be divided more or less equally among two or more states").  Likewise this principle would apply if we were to adopt Emerson's argument that it is the contamination sites which are the places of performance.  As noted, the sites covered by the policies at issue are scattered throughout several states.  Thus, according to the Restatement, the place of performance in such a case would be of little significance.

However, notwithstanding the fact that the place of delivery, the place of the last act giving rise to a contract, and the place of performance may tend to favor the insurer, their significance is minor compared to the element of domicile.  Given the facts in this case, we conclude that the role of the domicile of the insured should be a dominant one.  See 4 Appleman on Insurance 2d §21.11, at 327 (1998) (in liability insurance context, "where the insured is headquartered in one state where the policies were delivered, that state's law will generally govern all coverage disputes").  We agree with the rationale articulated in  
Potomac Electric Power Co. v. California Union Insurance Co.
, 777 F. Supp. 968, 973-74 (D.D.C. 1991), wherein the court chose the law of the jurisdiction where the insured was located, in part because that headquarters, as the one jurisdiction which tied all the parties together, was "the location which appear[ed] to be most likely contemplated by the parties" as the source of law.   This is consistent with the Restatement's principle that the justified expectations of the parties are to be protected.  See Restatement (Second) of Conflict of Laws §6(2)(d); Explanatory Notes, Comment 
c
, at 12, Comment 
g
, at 15 (1971).   It also comports with the Restatement's emphasis on predictability and uniformity of result, and on ease in determination and application of the law to be applied.  See Restatement (Second) of Conflict of Laws §6(2) (f), (g) (1971).

As noted, Emerson, the parent of all the other plaintiffs, is a Missouri corporation with its principal place of business in Missouri.  We note here that the domicile of Emerson is not simply a passive, coincidental factor, where all other significant factors occurred elsewhere.  Rather, Emerson's domicile played an active, dominant and dynamic role in the procurement of all of these policies.  According to the record, the procurement of insurance for both Emerson and its subsidiaries was largely coordinated out of Emerson's corporate headquarters in St. Louis.  Michael Zimmer worked at Emerson's headquarters from 1964 to 1986, starting as corporate insurance manager in Emerson's treasury department, and later becoming head of Emerson's newly formed insurance risk management department.   Zimmer testified at deposition that he was responsible for the procurement of insurance coverages for Emerson and its companies.  His responsibilities included negotiating for the placement of insurance coverage, which required the gathering of information relating to Emerson's various businesses which were to be covered.  That information was provided by Emerson's various subsidiaries and divisions.  Zimmer was the "point person" for gathering this data, which was then reviewed with Emerson's insurance broker.  As companies were acquired by Emerson, Zimmer generally took on responsibility for their insurance, recommending "a program that would have typically involved their [the companies'] participation in Emerson's corporate insurance risk program."  He also testified that premium payments for the insurance policies were made from Emerson's offices in St. Louis.   Since Emerson's corporate treasury department and later its risk management department, both located at Emerson's headquarters in St. Louis, figured so prominently in the procurement of insurance not only for Emerson but also for its subsidiaries, the location of Emerson's headquarters in Missouri clearly merits significant weight in this analysis.  
Emerson disagrees, noting that three of the plaintiff subsidiaries (Appleton Electric Company, Commercial Cam Company, and PEPT Corporation) have their principal places of business in Illinois,
(footnote: 4) and arguing that the Illinois domicile of those plaintiffs thus outweighs "the one Missouri plaintiff."  We are not persuaded.  As has been shown, regardless of whether three subsidiary plaintiffs had their principal places of business in Illinois, the procurement of insurance coverage for both Emerson and its subsidiary companies was coordinated out of 

Emerson's corporate headquarters in Missouri.  Given that fact, it is irrelevant that the subsidiaries themselves had their principal places of business in Illinois or any other state.  

Notwithstanding the clear indications that insurance procurement was coordinated out of St. Louis, Emerson argues that since its primary broker, Marsh & McLennan,
(footnote: 5) as well as two sub-brokers, Avreco, Inc., and National Brokerage Agencies, Inc.(NBA), were largely located in Chicago, and since defendant insurers' agents and brokers also were primarily located in Chicago, the bulk of the policies at issue were actually purchased in Chicago.  We find this argument unpersuasive as well.  First, the primary brokers employed by Emerson (Marsh & McLennan and Lawton-Byrne-Bruner) were either headquartered in St. Louis (Lawton-Byrne-Bruner) or had offices in St. Louis (Marsh & McLennan).  Moreover, as shall be more fully discussed below, at least one of the Chicago sub-brokers, NBA, appears to have had a branch office in St. Louis.  Second, the brokers, wherever they might be, were essentially intermediaries operating between Emerson and its insurers.  To focus on the locations of the brokers generally instead of on the location of the corporate headquarters which coordinated insurance procurement company-wide would be to disregard the common-sense reality of the situation presented in this record.  Third, according to plaintiffs' submission of choice of law information to the trial court, while it was Marsh & McLennan's Chicago office which handled contacts with the insurance companies starting in 1978, "there is no evidence about which office [the Chicago or St. Louis offices] actually dealt with the insurance companies" prior to 1978.  As pointed out previously, the dispute here in question involves policies which were issued from 1941 to 1985.  According to Emerson, broker Marsh & McLennan obtained umbrella liability insurance for Emerson not only from 1978 to 1985, but also from 1965 to 1971.  Emerson's choice of law submission also indicates that when the St. Louis brokerage firm of Lawton-Byrne-Bruner (LBB) took over the job of acquiring umbrella insurance for Emerson in 1974, "it initially handled contacts with the insurance companies directly."  Any use by LBB of a Chicago broker did not commence until two years later, in 1976.    

As to the defendant insurers' brokers and agents, Emerson asserts for example that "Republic's policies, which are implicated at more sites and offer more coverage than any other defendant's policies, were underwritten by a Chicago broker, Cravens, [Dargan & Company]."  According to Emerson, "[r]epresentatives from Cravens' Chicago office negotiated the terms of the Republic *** policies with representatives from the Chicago office of Marsh & McLennan, and they did their negotiating in Chicago."  However, a letter which was attached to Emerson's opposition to Republic's summary judgment motion as to the Erie site indicates that a critical portion of the negotiations as to Republic's 1983-1984 policy apparently was conducted between NBA's office in St. Louis, and Cravens, Dargan's office in Houston, Texas.  As noted, Republic is a Delaware corporation with its principal place of business in Dallas, Texas.  The letter, dated January 24, 1984, is from (Emerson sub-broker) NBA in St. Louis and is addressed to Marilyn Schultz at Cravens, Dargan in Houston.  Schultz testified at deposition that she worked for Cravens, Dargan from 1974 until 1986 and that she did most of the underwriting for the two Republic policies at issue, the 1983-1984 policy (CDU 15502) and the 1984-1985 policy (CDU 16724).  The letter specifically references Emerson's Republic policy No. CDU 15502, "[e]ffective: November 1, 1983," and discusses a number of changes relative to that policy, including the request to delete the words "sudden and" from the policy's pollution exclusion.  

Thus neither the parties nor the record specifies with any clarity where each phase of the negotiation of these policies took place, nor the location of the brokerage branch offices which participated in these negotiations.  That reinforces our conclusion, noted earlier, that the locations of the respective parties' brokers and agents do not outweigh the Missouri location of the corporate headquarters which coordinated procurement of coverage for Emerson and its subsidiaries. 

Notwithstanding the foregoing, Emerson argues, as noted, that Illinois law should be applied rather than the law of Missouri.  According to Emerson, the law of Missouri would call for a narrow, temporal interpretation of the word "sudden" in the policies' pollution exclusions, thus violating Illinois public policy.  As that argument suggests, the single most significant factor in our discussion below of Missouri substantive law will be Missouri's interpretation of the language of the pollution exclusion.  

In making its "public policy" argument, Emerson asserts that when the insurance industry first sought to include the pollution exclusion in standard form policies, it represented to state regulators, including those in Illinois, that the exclusion would preserve the already-existing coverage for gradual pollution so long as it was accidental, 
i.e.
, unexpected and unintended.  According to Emerson, the purpose of the pollution exclusion was represented as being merely to clarify and not to change the existing coverage.  If the term "sudden" were now interpreted to mean "abrupt" and "instantaneous," Emerson contends, that would directly contradict the industry's representations.  According to Emerson, Illinois public policy requires that the pollution exclusion be interpreted in accordance with the industry's representations and not as a bar to coverage for accidental pollution which occurs over time.  Hence Emerson argues that if Missouri law were to apply here, it "would reward defendants for misrepresentations" and would thereby violate Illinois policy.  We disagree.

We note that there is no case in Illinois which would specifically urge that misrepresentations to its state regulators would be sufficient to invoke a public policy determination for purposes of choice of law.  However, there is a conflict among other jurisdictions as to this question.  Decisions which do so hold include two cases cited by Emerson from foreign jurisdictions, 
Joy Technologies, Inc. v. Liberty Mutual Insurance Co.
, 421 S.E.2d 493 (W. Va. 1992), and 
Morton International, Inc. v. General Accident Insurance Co.
, 629 A.2d 831 (N.J. 1993).  On the other hand there is a federal district court case in Georgia which would reject the premise in 
Joy Technologies
 and 
Morton
.  See 
North Georgia Petroleum Co. v. Federated Mutual Insurance Co.
, 68 F. Supp. 2d 1321 (N.D. Ga. 1999) (holding that absolute pollution exclusion did not violate public policy despite possible misrepresentations by insurance industry to state authorities; under Georgia law, insurance policy exclusion is unenforceable as violating public policy only if there is statutory mandate that the coverage in question be provided).  We need not here choose between these two approaches, since there is no indication in this record that any misrepresentation was ever made to Illinois regulators concerning the construction which insurers intended to give to the pollution exclusion language.  

As noted, Emerson asserts that the insurance industry specifically represented to regulators in Illinois, as it did to those in other states, that the pollution exclusion was meant to clarify and not to change the existing coverage for liability arising from gradual pollution.  However, the portion of the record to which Emerson points does not support Emerson's assertion that such representations were made to regulators in Illinois.  The record includes a letter dated July 8, 1970, from CNA Insurance to James Baylor, the Illinois director of insurance, enclosing copies of two "endorsements," one of which was the pollution exclusion here at issue, and requesting "[t]he earliest effective date permitted by your regulations" for these endorsements.  The letter establishes only that a copy of the pollution exclusion was sent to the Illinois director of insurance in 1970.  There is nothing in the letter or in the remainder of the cited record portion to indicate that the aforementioned 
representations about
 the pollution exclusion were specifically made to Illinois regulators.  

Thus there is a significant difference between the instant case on the one hand, and 
Joy Technologies
 and 
Morton
 on the other.  The courts in both 
Joy Technologies
 and 
Morton
 
interpreted essentially the same pollution exclusion language as in the case at bar.  In 
Joy Technologies
, where a central issue was whether Pennsylvania or West Virginia law would apply, the West Virginia Supreme Court of Appeals noted that in seeking approval for the exclusion provision, the insurance companies had represented to the West Virginia insurance commissioner that the exclusion merely clarified and did not alter coverage for gradual pollution damage so long as it was unexpected and unintended.  The court cited public policy in holding that since defendant Liberty Mutual had represented to West Virginia that the pollution exclusion would have a meaning and effect different from that attributed to it under Pennsylvania law, which gave the exclusion a narrow, temporal interpretation, it should be West Virginia and not Pennsylvania law which governed the exclusion.  

Similarly, in 
Morton
 the New Jersey Supreme Court noted that the insurance industry had misled the New Jersey Department of Insurance as to the meaning of the exclusion clause.  On that basis, the court 
declined to give the pollution exclusion the narrow, temporal interpretation urged by the defendant insurers.

Thus in both 
Morton
 and 
Joy Technologies
 the courts referred to record evidence of misrepresentations made by insurers to the regulators of their own respective states, thereby concluding that a literal, narrow interpretation of the pollution exclusion would violate West Virginia and New Jersey public policy.  That differs markedly from the instant case, where the record portion cited by Emerson does not support Emerson's assertion that such misrepresentations were made to Illinois regulators.  In the absence of such evidence, we lack the factual predicate upon which to declare, as Emerson urges, that the application of Missouri law here would violate Illinois' public policy.  

Notwithstanding the foregoing, Emerson points to the Illinois case of 
United States Fidelity & Guaranty Co. v. Specialty Coatings Co.
, 180 Ill. App. 3d 378, 535 N.E.2d 1071 (1989) [hereinafter 
Specialty Coatings
], where the court concluded that if the term "sudden" in the pollution exclusion were interpreted to mean "abrupt" and "instantaneous," it would "contravene[] the insurance industry's announced intent in adding the pollution exclusion to the general liability policy."  
Specialty Coatings
, 180 Ill. App. 3d at 387, 535 N.E.2d at 1077.  

Thus the court in 
Specialty Coatings
 resolved what it termed the ambiguity in the policy language by construing it in favor of the defendant, Specialty Coatings, and against the plaintiff insurance carrier, thereby giving the pollution exclusion a broad rather than a narrow, temporal interpretation.  We conclude that Emerson's reliance upon 
Specialty Coatings
 is misplaced.  

First, while the court in 
Specialty Coatings
 did note that the insurance industry's representations as to the intent of the pollution exclusion were made to "various state insurance commissioners," nowhere does the court state that such representations were made to regulators in Illinois. 
Specialty Coatings
, 180 Ill. App. 3d at 387, 535 N.E.2d at 1077.  Second, 

the court cited those representations only as a policy construction device to support its broad 
interpretation
 of the pollution exclusion under Illinois law, not to show that applying the law of a different state which viewed the exclusion more narrowly would be contrary to Illinois public policy.  Indeed, choice of law is not addressed in 
Specialty Coatings
, and the term "public policy" is not mentioned.

We conclude that, absent some indication in the record that insurers made misleading representations to regulators 
in Illinois
, we are without a sufficient factual basis to declare that applying Missouri law to the pollution exclusion would violate Illinois public policy. 

Lastly, Emerson contends that regardless of which state's law would ordinarily apply under a choice-of-law analysis, the parties here are precluded from arguing for the application of Missouri law, either because they did not raise the argument below or because they took a position which is inconsistent with such a stance.  As noted, Emerson moved unsuccessfully in 1998 for reconsideration of the trial court's 1996 law-of-the-site ruling, arguing that the law of a single state, Illinois, should be applied.  According to Emerson's argument on appeal, defendants Republic and Commercial Union each sought the continued application of the law of the site in 1998, and they cannot now change their position.  Emerson contends that by taking that stance in opposition to Emerson's motion for reconsideration, Republic and Commercial Union waived the right to advocate any choice of law other than the law of the site.  Neither Home nor Central National opposed Emerson's motion for reconsideration, and for that reason Emerson argues that Home and Central National are barred from advocating any choice of law at all.  We disagree.  

In opposing Emerson's motion for reconsideration, Republic argued, as noted, that the trial court was not required to choose the law of a single state.  However, Republic also restated its position that under a "most significant contacts" approach, Missouri law should apply.  Commercial Union argued that the trial court should decline to revisit the choice-of-law issue "[b]ecause of the substantial prejudice to defendants if choice of law is altered at this late stage in the litigation."  Notwithstanding this argument, Commercial Union also stated that if the court 
were
 to revisit the issue, Missouri law should be applied because "Missouri is the state with the most significant contacts to this litigation." 

It is clear from this record that in arguing for the application of Missouri law in these appeals, neither Republic nor Commercial Union is advocating a position inconsistent with that which it espoused in the trial court.  
Cf.
 
Commercial Discount Corp. v. Bayer
, 57 Ill. App. 3d 295, 299, 372 N.E.2d 926, 928 (1978) (noting that "a theory inconsistent with that which is espoused in the trial court may not be considered on review").  The contentions of Republic and Commercial Union that Missouri law would apply under a significant contacts analysis were asserted as alternative arguments and thus were preserved  for appeal.  See 
Continental Training Services, Inc. v. Cavazos
, 893 F.2d 877, 881 n.5 (7
th
 Cir. 1990); 
Perkins v. City of Chicago Heights
, 47 F.3d 212, 218 (7
th
 Cir. 1995).  Hence neither Republic nor Commercial Union has waived the right to seek the application of Missouri law.  Moreover, any such waiver in any event would not be jurisdictional since the waiver rule is "an admonition to litigants, not a limitation upon the jurisdiction of a reviewing court."  
American Federation of State, County & Municipal Employees, Council 31 v. County of Cook
, 145 Ill. 2d 475, 480, 584 N.E.2d 116, 118-19 (1991)
.  For that reason we also decline to hold that Home and Central National have waived the right to seek the application of Missouri law.

Thus, having concluded that Missouri law applies, we now must determine how Missouri construes the relevant language of the pollution exclusion.  
In applying Missouri law to the appeals at bar, the primary issue is whether that state's law gives a temporal interpretation to the term "sudden and accidental" in the pollution exclusion, or whether instead the term "sudden and accidental" simply means "unexpected" and the exclusion thus allows coverage for accidental pollution even if it is gradual and not abrupt.  We explain below how the pollution occurred at each site, thus evidencing the importance of this distinction.  Emerson takes the latter view that gradual pollution is covered, arguing that decisions to the contrary by the Eighth Circuit, discussed below, are merely predictions of what Missouri law might be and are not valid statements of that law.  According to Emerson, since there is no binding Missouri precedent on this issue, it is not inconsistent with Missouri law that Emerson's claims would be covered under the "sudden and accidental" exclusion.  We disagree.

It is undisputed that there are no Missouri appellate court decisions interpreting the meaning of "sudden" as used in an exclusion for intentional pollution.  However, the Eighth Circuit has addressed this issue.  In 
Aetna Casualty & Surety Co. v. General Dynamics Corp.
, 968 F.2d 707, 710 (8
th
 Cir. 1992) [hereinafter 
General Dynamics II
], the court held that under Missouri law the term "sudden and accidental" is unambiguous.  Because Missouri law requires that the terms of an insurance contract be given their plain meaning, the word "sudden" means "abrupt."  If it meant "unexpected," it would simply repeat the meaning of "accidental," which includes the unexpected.  Thus the term "sudden" would be superfluous, and that would go against the requirement under Missouri law that all of the terms of an insurance contract be given meaning.  The term "sudden and accidental" therefore joins together both the immediate and the unexpected.  See also 
Liberty Mutual Insurance Co. v. FAG Bearings Corp.
, 153 F.3d 919, 923 (8
th
 Cir. 1998) [hereinafter 
FAG Bearings
] (rejecting argument that 
General Dynamics II
 is incorrect prediction of Missouri law; following 
General Dynamics II
 in holding that the term "sudden" refers to an unexpected event which does not occur gradually); 
Charter Oil Co. v. American Employers' Insurance Co.
, 69 F.3d 1160, 1163-66 (D.C. Cir. 1995) (adopting the 
General Dynamics II
 interpretation of "sudden and accidental"
; concluding that the 
General Dynamics II
 court did not misread Missouri law).  

As noted, Emerson argues in essence that since no Missouri appellate court has ruled on this issue, we should assume that allowing coverage for Emerson's claims under the "sudden and accidental" pollution exclusion would be consistent with Missouri law. That would be a risky assumption even if there were no Eighth Circuit holdings to the contrary.  As it is, we decline to 

hold as Emerson urges, in the absence of guidance from Missouri courts, and in the face of the above-mentioned decisions in 
General Dynamics II
 and 
FAG Bearings
, as well as 
Charter Oil
.  In our view, the term "sudden and accidental" in a pollution exclusion clearly means both abrupt and unexpected under Missouri law.  

Emerson concedes as much in its reply brief when it asks that, if Illinois law is chosen, we reverse the granting of summary judgment in favor of Republic, Home, Commercial Union and Central National at both the Erie and York, Pennsylvania, sites, but that "under any other choice of law, [we] reverse only the trial court's order granting summary judgment on Republic's amended exclusion at these sites."  As noted, Republic's 1983-1984 policy is the only one at issue which includes an "amended exclusion" with the words "sudden and" omitted.  The remaining policies all contain the standard form exclusion barring coverage unless the pollution is both "sudden and accidental."  

As further noted, Emerson stipulated that there was no evidence of an abrupt discharge at either the York or Erie sites.  Hence because all but one of the policies at issue at those sites includes the "sudden and accidental" exclusion, we affirm the trial court's granting of summary judgment in favor of Home and Commercial Union as to the Erie and York sites, in favor of Republic as to its 1984-1985 policy with regard to those sites, and in favor of Central National as to the York site.  Judgments still to be addressed include: the granting of summary judgment in favor of Republic as to its 1983-1984 policy with regard to the York and Erie sites; the granting of summary judgments in favor of Republic as to the Dixiana, South Carolina, site, and in favor of Republic and Home as to the Maysville, Kentucky, site; and the denial of Emerson's motion for summary judgment as to the Hatfield, Pennsylvania, site. 

Summary judgment as to the Erie and York sites
  

As noted, the site at issue in Erie, Pennsylvania, is the Millcreek Dump, which was operated from 1941 until it was closed by the state in 1981.  Urick Foundry (Urick), a division of one of Emerson's subsidiaries, allegedly sent foundry sand to the Millcreek site during the period from 1973 to 1981.  The sand and other wastes were removed from the foundry mainly by a local hauler, the Sitter Trucking Company.  Metals, solvents, and PCBs were found in soil and groundwater at the site.  The EPA sued Emerson over the Millcreek matter, and in 1995 or 1996 Emerson entered into a consent decree under which Emerson paid $600,000.  Additionally, Emerson paid $110,000 in 1996 to settle a suit brought by the Pennsylvania Department of Environmental Resources.  Neighboring landowners also have brought suit against Emerson.  According to Emerson, it has incurred expenses of $1.9 million in connection with this site.  

As to the York site, wastes generated by the A.B. Chance Company (Chance), an Emerson subsidiary from 1975 to 1987, were removed by a contractor from the Chance facility in 55-gallon drums and taken to a landfill in York.  As noted, when Emerson sold a majority share of Chance in 1987, Emerson retained Chance's liability for environmental property damage which occurred prior to the sale.  Subsequently, Chance was named as a potentially responsible party by the EPA in connection with the York site.  Emerson asserts that it has incurred expenses of $432,000 in connection with this site. 

As further noted, Republic moved for summary judgment as to both of these sites.  According to Republic, because the transport of wastes from Urick to the Erie site and from Chance to the York site took place over a number of years, 
those transports could not be accidental.  Thus there was no coverage for the relevant releases of contaminants under Republic's 1983-1984 policy, which barred coverage for pollution unless it was accidental.  The trial court granted Republic's motion, focusing on the shipment of the wastes to the Erie and York sites and finding that because those shipments took place over a period of time, they were not accidental under Pennsylvania law.  Since we have determined that it is Missouri law which applies here, we review the trial court's decision with Missouri law in mind.

In its argument on appeal, Emerson notes that the wastes produced by Urick and Chance were hauled to the Erie and York sites by contractors.  According to the 
affidavits of J. Douglas James as to Urick, and of James Salsgiver as to Chance, both Urick and Chance believed that their respective wastes were being disposed of properly, and neither of them expected or intended that harm would be caused to the environment.  Emerson thus argues that since the pollution in these instances was unexpected it was therefore accidental under Missouri law, and thus the pollution exclusion in Republic's 1983-1984 policy did not apply.  We agree. 

Under Missouri law, "an accident includes that which happens by chance or fortuitously, without intention or design, and which is unexpected and unforeseen."  
Aetna Casualty & Surety Co. v. General Dynamics Corp.
, 783 F. Supp. 1199, 1208 (E.D. Mo. 1991) [hereinafter 
General Dynamics I
], 
rev'd in part on other grounds
, 968 F.2d 707 (8
th
 Cir. 1992).  Thus where a policyholder contracts with a waste hauler for the disposal of hazardous waste, subsequent releases of pollutants are considered accidental for purposes of insurance coverage so long as the insured had no knowledge that the wastes were to be disposed of improperly.  This is true even though the hauler may have acted intentionally.  See 
General Dynamics I
, 783 F. Supp. at 1207-08 (concluding that releases of toxic or hazardous wastes were an "accidental event" within the meaning of the pollution exclusion, where the defendant policyholder "neither expected nor intended the illegal and improper activity of the hazardous waste transporter that resulted in hazardous waste contamination").  

Support for that view of Missouri law on this issue is seen in 
N.W. Electric Power Cooperative v. American Motorists Insurance Co.
, 451 S.W.2d 356 (Mo. Ct. App. 1969), and in 
White v. Smith
, 440 S.W.2d 497 (Mo. Ct. App. 1969).  While neither of these Missouri court of appeals decisions specifically addresses the word "accidental" as used in an exception to a pollution exclusion, their interpretations of the term "caused by accident" are in line with the decision in 
General Dynamics I
.  In 
N.W. Electric
, the plaintiff cooperative, a supplier of electric power, sought coverage for damages to private property which resulted when the plaintiff exceeded an easement granted to it for construction of a power line over the property.  The court concluded that while the acts producing the damage might be termed intentional, the resulting harm was "caused by accident" within the meaning of the insurance policy, where there was no evidence that the plaintiff cooperative knew of the acts which caused the damage or directed them to be done, nor was there any evidence of an intent to injure.  
N.W. Electric
, 451 S.W.2d at 361-62.  Similarly, the court in 
White
 held that the contamination of a well was "caused by accident," where a slaughterhouse intentionally dumped blood and waste materials into a pond, and where seepage from the pond during an "indeterminable period" contaminated the well.  
White
, 440 S.W.2d at 509-11.  Thus it made no difference in 
N.W. Electric
 or in 
White
 whether the precipitating 
acts causing
 the damage were intentional, and it made no difference in 
White
 whether they were done over a period of time.  Similar to 
General Dynamics I
, the focus in each case is on the resulting damage and whether 
it
 was intentional.  

In the instant case, it is undisputed that the words "sudden and" were deleted from the pollution exclusion in Republic's 1983-1984 policy and that the exclusion thus allowed coverage for releases which were "accidental."  In addition, the language of that exclusion, with the exception of the aforementioned deletion, is substantially identical to the pollution exclusion in 
General Dynamics I
, and the circumstances here are essentially similar to the situation in 
General Dynamics I
.  As indicated, J. Douglas James, who held management positions at the Urick Foundry in Erie, Pennsylvania, from 1954 to 1979, testified by affidavit that the wastes generated by the foundry were removed mainly by the Sitter Trucking Company and that Urick expected and intended that Sitter would dispose of the wastes in such a way that there would be no harm to the environment.  Similarly, James Salsgiver, who was employed at the Chance facility in York, Pennsylvania, from 1954 to 1990, testified by affidavit that wastes generated at the facility were removed by a contractor in 55-gallon drums and taken to the landfill site in York, and that Chance neither expected nor intended that the disposal of its wastes would cause damage to the environment.  

Those affidavits at minimum raise a triable issue as to whether the releases of pollutants at the York and Erie sites were accidental under Missouri law and thus would be covered under Republic's 1983-1984 policy. 
 Summary judgment is inappropriate where there are such genuine issues of material fact. See 
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736, 739-40 (1993); 
Superior Equipment Co. v. Maryland Casualty Co.
, 986 S.W.2d 477, 481 (Mo. Ct. App. 1998).  

Notwithstanding the foregoing, Republic argues that under Missouri law it is the intentional or unintentional nature of the 
initial discharge
 or shipment of pollutants which is the proper focus, not "any subsequent migration" of pollutants.  Thus according to Republic it makes no difference whether it was the policyholder who actually discharged the wastes into the environment.  Republic finds some support for its position in the federal district court opinion in 
Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.
, 842 F. Supp. 575 (D.D.C. 1994) [hereinafter 
IPC
].  In 
IPC
, the plaintiffs sought coverage for expenses incurred as a result of claims arising from the spraying of hazardous waste material as a dust suppressant at a number of sites in Missouri.  In granting summary judgment for the defendant insurers, the court held that it made no difference that the insured was not the party who intentionally discharged the waste materials into the environment.  "Because [the independent contractor] intended the discharging acts themselves, they could not have been 'accidental'" within the meaning of the pollution exclusions at issue.  
IPC
, 842 F. Supp. at 585.  

Thus 
IPC
's interpretation of Missouri law is inconsistent with that of 
General Dynamics I
.  However, we note that 
General Dynamics I
 was decided by a U.S. district court in Missouri, while the decision in 
IPC
 was issued by a court in the District of Columbia.  We thus find 
General Dynamics I
 more persuasive than 
IPC
 not merely in its reasoning but also because it was decided by a court in Missouri as opposed to a court located outside the state.  
Cf.
 
Charter Oil Co. v. American Employers' Insurance Co.
, 69 F.3d 1160, 1164 (D.C. Cir. 1995) ("Judges of the home circuit are likely to be more experienced in the law of states within their circuit than are outsiders").  Moreover, as noted, the 
General Dynamics I
 view of Missouri law on this issue is strongly supported by decisions of the Missouri court of appeals.  See 
N.W. Electric Power Cooperative v. American Motorists Insurance Co.
, 451 S.W.2d 356 (Mo. Ct. App. 1969); 
White v. Smith
, 440 S.W.2d 497 (Mo. Ct. App. 1969).   

Accordingly, we reverse the trial court's granting of summary judgment in favor of Republic as to its 1983-1984 policy with regard to the sites at Erie and York, Pennsylvania. 

Summary judgment as to the Maysville, Kentucky, site

As noted, groundwater and soil at Emerson's Browning Manufacturing (Browning) facility in Maysville, Kentucky, were found to contain solvents, volatile organic compounds, and total petroleum hydrocarbons.  A 420-foot railroad spur which has been in existence for more than 80 years is located on the property.  

According to Emerson, two portions of this site, the railroad spur and Chester Street, are contaminated with industrial solvents such as trichloroethylene (TCE).  The Kentucky Department for Environmental Protection is overseeing cleanup of the site.  Emerson asserts that more than $1.9 million has been spent in connection with this site.  

As further noted, Republic, joined by Home, moved for summary judgment as to the Maysville, Kentucky, site, arguing that the damage for which Emerson seeks coverage arose from Emerson's intentional discharge of contaminants over a period of time as part of its routine business operations.  Hence the environmental damage was not caused by a sudden or accidental event as is required under the pollution exclusions in Republic's and Home's policies, and there is thus no coverage under those policies.  The trial court granted summary judgment in favor of Republic and Home as to the Maysville site.  The court rejected Emerson's argument that a degreaser accident in the 1960s which allegedly resulted in a sudden and accidental release of solvent was a cause of the contamination at issue, concluding instead that the contamination resulted from Emerson's "routine and deliberate business practices" and thus was not covered under the policies at issue.

According to Republic and Home, the main contamination at this site occurred along the rail spur when waste oil (which was mixed with solvents) dripped from metal chips and shavings which had been loaded into rail cars on the spur.  Republic and Home argue that this contamination resulted from Emerson's routine business operations and thus cannot be termed accidental within the meaning of their policies.  In its argument on appeal, as in the trial court, Emerson points to evidence of a degreaser accident in the 1960s which resulted in a sudden, accidental release of 150 to 300 gallons of TCE onto the Chester Street area of the property.  Emerson thus argues that regardless of the contamination along the rail spur, its evidence of a sudden and accidental spill of TCE in the Chester Street area raises a triable issue as to whether that spill, which satisfies the pollution exclusion requirements, caused damage for which Emerson is liable.  We agree with Emerson.

There is undisputed evidence that the spill to which Emerson refers took place.  Attached to Emerson's opposition to Republic's summary judgment motion are excerpts from the depositions of no less than five former employees which give clear and sometimes gripping accounts of the fatal accident.     According to these employees, some of whom were eyewitnesses, the (March 12, 1968) incident occurred when a maintenance employee named Myron Harber climbed inside a degreaser machine in order to lubricate it.  While he was standing on a conveyor above a tank of boiling degreaser (TCE), Harber accidentally tripped a mechanism which lowered him into the degreaser tank.  During the ensuing rescue attempt, the tank was drained, abruptly emptying some 150 gallons of degreaser onto the building's second floor where the machine was located.  According to witnesses, the degreaser dripped down onto the first floor of the building and then flowed out onto Chester Street, going down into cracks in the pavement and apparently disappearing into the ground. 

Also attached to Emerson's opposition to Republic's motion is the affidavit of Stavros Papadopulos, a hydrology expert, who opined that this abrupt spill of some 150 to 300 gallons of TCE contaminated "unsaturated materials and *** the groundwater beneath Chester Street."  According to Papadopulos, the pattern of groundwater contamination in that area is consistent with such a TCE spill.  Thus, "this documented TCE spill from the degreaser significantly contributed to the total solvent contamination at Plant I of the Browning facility."  

Defendants have conceded that the spill occurred, but they dispute whether it contributed to the contamination at the Maysville site.  Even if it did cause some contamination, Republic and Home argue that the degreaser spill was merely a single event which does not outweigh the pattern of gradual pollution which they contend arose from Emerson's routine business operations.  We disagree.

Regardless of whatever pattern of pollution existed at the railroad spur, and regardless of whether that pollution was a product of routine business practices, the evidence of the degreaser spill, which by its very nature appears to have been sudden and accidental, is sufficient to provide a basis for recovery if it in fact contributed to the pollution in the Chester Street area.  See 
Nashua Corp. v. First State Insurance Co.
, 648 N.E.2d 1272 (Mass. 1995) (concluding that while most of the releases at issue were the result of routine business practices, evidence that some releases were sudden and accidental raised triable issue as to what portion of the pollution damage was caused by such releases); 
Employers Insurance of Wausau v. Petroleum Specialties, Inc.
, 69 F.3d 98 (6
th
 Cir. 1995) (evidence that some releases were accidental, though insufficient to warrant summary judgment in favor of the policyholder, nevertheless was enough to enable the policyholder to defeat summary judgment).  Emerson thus has raised at minimum a triable issue as to whether at least some of the pollution for which it is liable at the Maysville site was caused by a sudden and accidental release.  Summary judgment therefore is inappropriate where there are such genuine issues of material fact.  See 
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736, 739-40 (1993); 
Superior Equipment Co. v. Maryland Casualty Co.
, 986 S.W.2d 477, 481 (Mo. Ct. App. 1998).  

Accordingly, we reverse the trial court's granting of summary judgment in favor of Home and Republic as to the Maysville, Kentucky, site. 

Summary judgment as to the Dixiana, South Carolina, site

Between 1978 and 1980, South Carolina Recycling and Disposal, Inc. (SCRDI) stored more than 1,100 drums of materials  at its two-acre site in Dixiana Township, South Carolina.  Emerson's Therm-O-Disc facility in Aiken, South Carolina, which manufactures thermostats and other temperature controls, allegedly sent materials including PCE, TCA, waste oil, acetone and glycol to the Dixiana site.  In 1989, the EPA wrote to Therm-O-Disc, which had been identified as a potentially responsible party under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), demanding reimbursement for costs the EPA incurred in response to health and environmental concerns at the Dixiana site.  Subsequently Therm-O-Disc and two other defendants informed the U.S. Justice Department that they were willing to reimburse the United States for response costs totaling about $4 million.  Emerson estimates that it has spent more than $1.7 million in connection with this site.  

As noted, Republic moved for summary judgment as to the Dixiana site, arguing that the costs for which Emerson sought coverage were for government-mandated cleanup, and that under South Carolina law, such relief was equitable in nature and did not constitute legal "damages" as defined in Republic's policies.  As further noted, the trial court granted Republic's motion, agreeing with Republic that under South Carolina law Emerson's claims were in the nature of equitable relief and therefore not covered damages under Republic's policies.

Under Missouri law, which we have determined is to be applied here, the term "damages" as used in the Republic policies includes equitable relief such as the environmental response costs for which Emerson seeks coverage.  See 
Farmland Industries, Inc. v. Republic Insurance Co.
, 941 S.W.2d 505, 512 (Mo. 1997) (concluding that under Missouri law, the ordinary meaning of "damages" includes environmental response costs required by the government; thus, "environmental response costs incurred pursuant to CERCLA and similar state laws are 'damages' within the meaning of the policies").  In the instant case Republic concedes that "Missouri courts construe the 'as damages' language contained in the Republic policies to include environmental response costs."   Republic thus is not entitled to summary judgment as a matter of law.  See 
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736, 739-40 (1993); 
Superior Equipment Co. v. Maryland Casualty Co.
, 986 S.W.2d 477, 481 (Mo. Ct. App. 1998).  Accordingly, we reverse the granting of summary judgment in favor of Republic as to the Dixiana, South Carolina, site.  

Emerson's motion as to the Hatfield, Pennsylvania, site

Brooks Instruments (Brooks), a division of Emerson, manufactured precision instruments and calibration equipment at its Church Road facility near Hatfield, Pennsylvania, from about 1964 to 1969.  In 1987, the EPA named Brooks a potentially responsible party as to the Hatfield site (also called the North Penn Groundwater site), which encompasses a contaminated aquifer running beneath the Hatfield area.  According to a May 7, 1987, letter from the EPA to Brooks, groundwater contamination had affected "a major municipal water supply as well as a number of private residential wells."  Various solvents, including TCE, were found in the aquifer.  By letter dated April 6, 1989, hydrogeologist James Freeman of Papadopulos & Associates informed plaintiffs' counsel that low levels of TCE were found near the former Brooks facility and that, while it was possible the TCE had migrated from offsite sources, a soil sample suggested that some TCE was discharged within the Brooks facility property itself.  
Emerson indicates that it has spent $148,000 in connection with this site.   

As noted, Emerson moved for summary judgment against Republic as to the Hatfield site, limiting its motion to Republic's 1983-1984 policy.  Emerson argued that accidental releases of TCE which occurred during Brooks' operations at the Church Road facility in the 1960s contaminated the aquifer, and that Emerson's costs in remediating the site are covered under Republic's 1983-1984 policy.  As further noted, the trial court denied Emerson's motion, concluding that evidence of TCE contamination in the groundwater, by itself, was insufficient under Pennsylvania law to trigger coverage where Emerson had not provided evidence of an "occurrence," 
i.e.
, spills or leaks at the Brooks facility which caused the contamination.  Thus there was no coverage for the damage under Republic's 1983-1984 policy.  The court subsequently certified this decision for interlocutory appeal pursuant to Supreme Court Rule 308, and this court allowed it.  The following question was certified: "[D]id Plaintiffs satisfy the burden of proving an 'occurrence,' as defined in Defendants' policies?"    

The "Insuring Agreements" portion of Republic's 1983-1984 policy includes the following agreement: 

"To indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of 'ultimate net loss,' because of:

(a) personal injury, 

(b) property damage, 

(c) advertising liability,

 as defined herein and caused by or arising out of an occurrence anywhere in the world."  (v. 2 supp. 402)

The policy defines "occurrence" as "(a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in personal injury, property damage, or advertising liability (either alone or in combination) neither expected nor intended from the standpoint of the Insured."   

Emerson argues on appeal that since the definition of "occurrence" lists the terms "accident," "event," and "exposure to conditions" in the disjunctive, it is sufficient to show that there was an "exposure to conditions" which resulted in property damage, without also having to identify an individual causative "event."  According to Emerson, the continuous presence and migration of solvents in the Hatfield groundwater evidences that there was some "exposure to conditions" which resulted in property damage.  In addition, the damage occurred in part during Republic's policy period.  Thus Emerson argues that it has shown an "occurrence" within the meaning of Republic's policy.  Republic argues that since the definition states that an occurrence 
results
 in property damage, it is not enough to show that there was contamination in the aquifer.  Emerson must also identify a "causative event" such as a spill or series of spills linking the contamination to Emerson's operations.  We agree with Emerson that it has shown an occurrence.  

We previously determined that Missouri law would apply to the issues in this case.  However, since, as discussed below, there is apparently no Missouri case which has specifically addressed the issue before us, 
i.e.
, whether an "occurrence" as defined in the instant policy requires not only an exposure to conditions which resulted in property damage, but also the identification of a specific event which caused the exposure, we presume that Missouri's law as to this issue is the same as that of the forum, Illinois.  See 
Stro-Wold Farms v. Finnell
, 211 Ill. App. 3d 113, 118, 569 N.E.2d 1156, 1159 (noting "broad rule" that "in the absence of a showing to the contrary, [the laws of another state] will be presumed to be the same as the laws of the forum"); see also 29 Am. Jur. 2d 
Evidence
 §259 (1994) (noting frequently stated rule that "in the absence of a showing to the contrary, the law of a sister state will be presumed to be the same as the law of the forum").  

Republic points to cases which, it asserts, support the conclusion that under Missouri law an "occurrence" requires both causes and effects, 
i.e.
, proof of "a) an accident, event, or continuous or repeated exposure; b) resulting in; c) personal injury or property damage."  See 
Wood v. Metropolitan Property & Casualty Co.
, 10 S.W.3d 571 (Mo. Ct. App. 2000); 
Koch Engineering Co. v. Gibralter Casualty Co.
, 78 F.3d 1291 (8
th
 Cir. 1996).

Regardless of whether Republic's cases support that conclusion, they provide no guidance as to the specific issue before us, which as noted is whether an "occurrence" requires both an exposure to conditions and a specific accident or event which caused the exposure. 

The main issue in 
Wood v. Metropolitan Property & Casualty Co.
, 10 S.W.3d 571 (Mo. Ct. App. 2000), is whether the appellants/garnishors sustained any actual damages constituting "bodily injury" or "property damage" as required under the insurance policy's definition of "occurrence."  In the underlying litigation, the appellants had obtained a judgment against the defendant for intercepting their telephone conversations in violation of state law.  They instituted a garnishment against the defendant's insurer, but the garnishment was quashed by the trial court.  In upholding that judgment, the appellate court concluded that "[g]arnishors neither pled nor proved that their 
presumed
 damage constituted either 'bodily injury' or 'property damage' as defined in the policy."  (Emphasis added.)  
Wood
, 10 S.W.3d at 574.  In the instant case, by contrast, it is undisputed that there was property damage.  The issue here is whether that property damage, evidencing a continuous exposure to conditions, is sufficient to establish an occurrence, or whether a specific event which caused the exposure is also required.  While the damages referred to in 
Wood
 are distinct from the conduct alleged to have caused them, that distinction is an insufficient basis from which to infer that an occurrence requires proof of both a continuous exposure and a causative event.  Indeed, that issue is not even addressed in 
Wood
.

In 
Koch Engineering Co. v. Gibralter Casualty Co.
, 78 F.3d 1291 (8
th
 Cir. 1996), the court concluded that an occurrence was established since there was no evidence that the policyholder intended the damage which resulted when a filtration system malfunctioned and had to be replaced.  The focus was on whether the policyholder's reckless conduct in designing the system meant that the damage was intentionally caused.  Here, by contrast, intent is not an issue.  Moreover, similar to 
Wood
, while the distinction between the damage and the reckless conduct which caused it is necessarily implicit in 
Koch
's intent analysis, there is no basis from which to infer that an occurrence therefore requires both an exposure and a causative event.  As was the case in 
Wood
, this issue is not addressed in 
Koch
.  

Republic also cites 
United States v. Conservation Chemical Co.
, 653 F. Supp. 152, 194-95 (W.D. Mo. 1986), for the proposition that Missouri courts require both a cause and an effect in order to establish an "occurrence."  The court in 
Conservation Chemical
 stated that "for coverage to exist under the typical CGL policy, it is necessary to establish the existence of either bodily injury or property damage which is caused by an occurrence within the period of the policy."  This does little more than track language similar to that in Republic's policy stating that the policy covers personal injury, property damage, and advertising liability "caused by or arising out of an occurrence."  It does not address the question of whether an occurrence requires both a continuous exposure and a causative event.     

Accordingly, in the absence of clear guidance on this issue from either Missouri state courts or federal courts construing Missouri law, we presume, as per the aforementioned rule, that Missouri's law on this question is the same as the law of the forum, Illinois.  See 
Stro-Wold Farms
, 211 Ill. App. 3d at 118, 569 N.E.2d at 1159; 29 Am. Jur. 2d 
Evidence
 §259 (1994).

United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 643 N.E.2d 1226 (1994) [hereinafter 
U.S. Gypsum
], is instructive as to Illinois law on this issue.  In 
U.S. Gypsum
, the court looked at language similar to that in the Republic policy, including the definition of "occurrence," and concluded that in situations where the property damage at issue is "progressive" and "inseparable," such as that caused by "chemical seepage" or the release of asbestos fibers, coverage is triggered by the initial exposure and continues through the entire destructive process.  See 
U.S. Gypsum
, 268 Ill. App. 3d 598, 604-05, 639-45, 643 N.E.2d 1226, 1230-31, 1252-56 (1994) (applying "continuous trigger" approach under which every policy in place during ongoing destructive process (beginning, in the case of asbestos, with exposure to or installation of asbestos) is triggered).  Further, the specific release or event which caused the damage need not be identified.  See 
U.S. Gypsum
, 268 Ill. App. 3d at 646-47, 643 N.E.2d at 1257 (rejecting argument that individual releases must be pinpointed; noting difficulty of finding historical evidence of releases).  Hence in Illinois it is sufficient to show an "exposure to conditions" as stated in the Republic policy's definition of occurrence, without also having to identify the specific event or release which caused the exposure.  

In the instant case it is undisputed that there were reports of TCE in the groundwater under the Hatfield site as early as 1979, and that TCE contamination was found in a North Penn Water Authority (NPWA) production well on the site as early as 1980.  It is also undisputed that the NPWA funded several investigations beginning in 1980 regarding contamination of its wells, and that in May of 1987 Brooks (Emerson) received a letter from the EPA naming it a potentially responsible party as to the Hatfield site.  As noted, that letter indicated that groundwater contamination had affected "a major municipal water supply as well as a number of private residential wells."   

According to hydrogeologist James Freeman, low levels of TCE were found near Emerson's former Brooks plant, suggesting that some TCE was discharged within that property.  Though this TCE might have traveled via groundwater flow from source areas to the north, Freeman asserted that "it can not be ruled out that occupants of the former Brooks Instruments building have discharged some TCE."  Deposition testimony from Emerson employees indicated that TCE was used at the Brooks facility mostly for cleaning operations.  

The record evidence of TCE contamination at the Hatfield site supports the conclusion that there was a continuous "exposure to conditions" resulting in property damage during Republic's policy period.  Under Illinois law Emerson has met its burden of proving an "occurrence" as defined in Republic's 1983-1984 policy.  We thus answer the certified question in the affirmative.  Accordingly, we reverse the trial court's denial of Emerson's motion for summary judgment against Republic as to the Hatfield, Pennsylvania, site.   

In summary, we affirm the trial court's granting of summary judgment in favor of Home and Commercial Union as to the Erie, Pennsylvania, site (appeal No. 98-4780), and in favor of Home (appeal No. 99-244) and Commercial Union (appeal No. 98-4780) as to the York, Pennsylvania, site; we affirm the granting of summary judgment in favor of Republic as to its 1984-1985 policy with regard to the Erie and York sites (appeal No. 98-4780); and we affirm the granting of summary judgment in favor of Central National as to the York site (appeal No. 98-4780).  

We reverse the trial court's granting of summary judgment in favor of Republic as to its 1983-1984 policy with regard to the York and Erie sites (appeal No. 98-4780); we reverse the granting of summary judgment in favor of Republic and Home as to the Maysville, Kentucky, site (appeal No. 98-4780); we reverse the granting of summary judgment in favor of Republic as to the Dixiana, South Carolina, site (appeal No. 98-4780); and we reverse the denial of Emerson's motion for summary judgment against Republic as to the Hatfield, Pennsylvania, site (appeal No. 98-4762), remanding for further proceedings consistent with this opinion.  

No. 98-4780 - Affirmed in part, reversed in part and remanded.

No. 99-244 - Affirmed.

No. 98-4762 - Reversed and remanded.

COUSINS and McBRIDE, JJ., concur.  

  

FOOTNOTES
1:
According to Emerson, just prior to the entry of the orders appealed from here, there were eleven plaintiffs and 10 defendants remaining, with the number of contamination sites reduced to 43 in 20 states.

2:
By this time, Emerson's second amended complaint had already been filed. 
 

3:
In reaching this conclusion we must maintain a perspective not only as to the sites and policies under appeal, but as to all of the policies and sites at issue in Emerson's suit, whether under appeal or not.  

4:
Three other subsidiary plaintiffs (Copeland Corporation, Ridge Tool, and Therm-O-Disc) are Ohio corporations with their principal places of business in Ohio.  

5:
According to Emerson, Marsh & McLennan is "a national insurance brokerage with offices in St. Louis and Chicago."